DECISION AND JUDGMENT ENTRY
{¶ 1} Shannon L. Dunn ("Shannon") appeals the decision of the Pickaway County Court of Common Pleas, Juvenile Division, awarding legal custody of her son, Stephen P. Karr ("Stephen") to Ronald and Beatrice Karr ("Ron" and "Bea", collectively "the Karrs"). Shannon argues that the trial court abused its discretion in finding that she is unsuitable as a parent. Because we find that there was some competent, credible evidence to support the trial court's conclusion that Shannon is unsuitable to have custody of Stephen, we disagree.
 I. {¶ 2} Ron raised his daughter, Shannon, after divorcing her mother. He married Bea when Shannon was approximately twelve years old. When Shannon was approximately twenty-one, she became pregnant with Stephen. Shannon had a difficult pregnancy, during which she relied upon the support and assistance of the Karrs. After Stephen's birth, Shannon continued to live with the Karrs and relied upon them to assist with Stephen's care. Shannon moved in and out of their home on several occasions. She eventually moved to Chillicothe, taking Stephen with her, and married Timothy Dunn ("Tim"). During this time, Shannon relied upon the Karrs to care for Stephen on the weekends, and when she had things to do during the week. Thereafter, Shannon and Tim (collectively "the Dunns") moved to Jackson County, Ohio, leaving Stephen with the Karrs for at least several weeks until their house had electric service. In May 2002, they moved to Lockport, New York with Stephen and their son, Dakota. Shannon gave birth to a daughter, Barbara, after the family moved to New York.
 {¶ 3} Stephen has suffered, and continues to suffer from a number of health problems, including a bowel condition, ear infections, profound hearing loss in his right ear, a mouth infection, and tooth decay so severe that he has had numerous root canals and caps on many of his teeth. Throughout Stephen's life, Children's Hospital, and the Children's Hospital Clinic have provided the majority of his medical treatment.
 {¶ 4} Before the Dunns' move to New York, Ron and Bea maintained a close relationship with Stephen. Shannon often left Stephen in Ron and Bea's care. After Shannon and Tim's marriage, Ron and Bea also sought and obtained grandparent visitation rights through Ross County, which entitled them to exercise regular weekend visitation with Stephen. Ron acknowledged that he reported Shannon to the child protective services agencies in Pickaway, Ross, and Jackson Counties, due to his concern for the living conditions in Shannon's home and, consequently, Stephen's well being.
 {¶ 5} The Karrs and the Dunns have a severely strained relationship. An altercation between Ron and Tim, which occurred when Ron and Bea returned Stephen to the Dunn home after their visitation, resulted in the filing of criminal complaints.
 {¶ 6} After the Dunns relocated to New York, the Karrs went to New York to get Stephen and exercise the two-week summer visitation pursuant to the Ross County visitation order. They returned him to New York at the end of their visitation time. However, they returned the following Friday to pick Stephen up for their regularly scheduled weekend visitation. At that time they informed Shannon that it would be her responsibility to pick Stephen up at their home the following Sunday evening and return him to New York. Due to a complicated pregnancy, Shannon was unable to travel to Ohio to retrieve Stephen. Therefore, Stephen remained in Pickaway County with the Karrs.
 {¶ 7} On August 21, 2002, the Karrs filed a complaint seeking custody of Stephen and a motion seeking temporary custody of Stephen in the Pickaway County Court of Common Pleas, Juvenile Division. The complaint named both Shannon and Jamie Nicholson, Stephen's biological father, as defendants. The record reflects that Jamie has had only limited involvement in Stephen's life since genetic testing conducted by the Pickaway County Child Support Enforcement Agency determined he was Stephen's father in 1999.
 {¶ 8} The trial court granted the Karrs' motion for temporary custody and granted Shannon some limited visitation with Stephen, to be exercised in her mother, Leda's, home in Chillicothe, Ohio. After conducting a hearing on the complaint for custody, the trial court issued a memorandum decision, denying Shannon's motion to dismiss for lack of jurisdiction, awarding legal custody of Stephen to the Karrs, and companionship to Jamie Nicholson and Shannon Dunn.[2]
 {¶ 9} Shannon Dunn appeals, raising the following assignment of error: "The trial court abused its discretion by finding mother, Shannon L. Dunn, unsuitable as a parent."
 II. {¶ 10} A natural parent's "desire for and right to `the companionship, care, custody, and management of his or her children'" is a fundamental interest far more precious than any property right. Lassiter v. Dept. of Social Svcs. (1981)452 U.S. 18, 27, quoting Stanley v. Illinois (1972), 405 U.S. 645,651. In Ohio, the general rule regarding original custody awards in disputes between the natural parents and a third-party is that "* * * parents who are `suitable' persons have a `paramount' right to the custody of their minor children unless they forfeit that right by contract, abandonment, or by becoming totally unable to care for and support those children." In re Perales
(1977), 52 Ohio St.2d 89, 97, citing Clark v. Bayer (1877),32 Ohio St. 299, 310. (Footnote omitted.) This rule is a change from previous caselaw, where the courts either looked primarily to the "best interest of the child," see, Clark v. Bayer (1877),32 Ohio St. 299, 305 (holding that the welfare of the minor is of paramount consideration), or to the "suitability of the parent" see, Baxter v. Baxter (1971), 27 Ohio St.2d 168, paragraph one of the syllabus (holding that a court has no authority to award custody of a minor child to another relative unless it has found that neither parent is a suitable person to have custody).
 {¶ 11} The Perales Court recognized the need to balance the welfare or "best interests" of the child with the parent's right to care for his or her child, and determined that "parents may be denied custody only if a preponderance of the evidence indicates abandonment, contractual relinquishment of custody, total inability to provide care or support, or that the parent is otherwise unsuitable that is, that an award of custody would be detrimental to the child." Perales at 98. The Perales Court indicated that the last criterion, other unsuitability, "* * * allows the court to balance the interests of parent and child."Id. Further, the Perales Court noted that by analyzing a parent's suitability, measured "* * * in terms of the harmful effect of the custody on the child, rather than in terms of society's judgment of the parent * * *", the welfare of the child would be given priority in balancing the interests of the child and the parent.
 {¶ 12} Pursuant to R.C. 2151.23(A)(2), the juvenile court has exclusive, original jurisdiction over the determination of "the custody of any child not a ward of another court of this state [,]" including disputes between parents and non-parents. See Inre Hockstok, 98 Ohio St.3d 238, 2002-Ohio-7208, at ¶ 15; In reDaily, Athens App. No. 02CA31, 2003-Ohio-787, at ¶ 6. A trial court has broad discretion in resolving custody matters and should be afforded the utmost respect. Reynolds v. Goll (1996),75 Ohio St.3d 121, 124. Therefore, we will not reverse a trial court's custody determination unless it involves an abuse of discretion. Bechtol v. Bechtol (1990), 49 Ohio St.3d 21, 23. Abuse of discretion connotes more than an error in judgment; it implies that the trial court's attitude was arbitrary, unreasonable, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. In applying the abuse of discretion standard of review, we are not free to merely substitute our judgment for that of the trial court. In re Jane Doe I (1991),57 Ohio St.3d 135, citing Berk v. Matthews (1990),53 Ohio St.3d 161.
 {¶ 13} Here, the trial court found that Stephen's father, Jamie Nicholson, was unsuitable because he had not had a significant relationship with Stephen since birth. Further, the trial court found he had contractually relinquished custody of Stephen to the Karrs by testifying that he believed the trial court should award legal custody of Stephen to the Karrs, and by failing to seek custody himself. The parties do not dispute that Jamie Nicholson is an unsuitable parent, and he has failed to appeal the trial court's determination.
 {¶ 14} Shannon, however, contends that the trial court unreasonably found her to be an unsuitable parent. We disagree. Although the trial court's decision relies primarily upon the testimony of the parties, some of which may be conflicting, the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility and the weight of the evidence. State v. DeHass (1967), 10 Ohio St.2d 230, syllabus. As a reviewing court, we must not substitute our judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment rendered by the trial court. Myers v. Garson (1993), 66 Ohio St.3d 610. Here, there is ample, competent, credible evidence in the record to support the trial court's conclusion that Shannon is unsuitable to parent Stephen, and that it is in Stephen's best interest that the court grant legal custody to the Karrs.
 {¶ 15} At trial, testimony revealed that despite a difficult pregnancy and a premature delivery, and without arranging for childcare, Shannon decided to return to work just three weeks after giving birth to Stephen. Because of Shannon's actions, the Karrs had to step in and provide for Stephen's care, missing work and using vacation time to ensure that someone was home to care for Stephen. Although Shannon returned to work, she did not provide any financial support for Stephen. Shortly thereafter, Shannon disappeared and abandoned Stephen for a period of three or four weeks.
 {¶ 16} Both Bea and Shannon testified extensively about Shannon's numerous moves from Stephen's birth in June 1998 to May 2002. During that 4 year period, testimony revealed that Shannon lived in at least six different homes: (1) with the Karrs; (2) with her Mother, Leda, in Frankfort, Ohio; (3) with a male companion at his mother's home in Pickaway County; (4) with Tim on Flint Drive in Chillicothe; (5) with Tim in Jackson County; (6) with Tim on Diesinger Road in Lockport, New York. Additionally, Shannon candidly admitted that the reason she and Tim packed up their family and moved to New York was to defeat the Karrs' court ordered visitation, rather than taking the steps necessary to modify the visitation order through the Ross County Court. Based upon this evidence, the trial court reasonably could have concluded that Shannon is unable to provide a stable living environment for Stephen, and that she has placed her own desires above Stephen's needs.
 {¶ 17} In addition to the instability caused by Shannon's frequent moves, testimony revealed that the living conditions in the Jackson County home, where the Dunns relocated in April 2001, were not suitable for a young child. Bea testified that the house initially lacked electricity and running water. Stephen stayed with the Karrs for approximately three weeks until the Dunns could get electricity. Bea further testified that the home lacked running water for an entire year. Shannon testified that she did not recall when they obtained running water, but indicated that it was possible that they did not have running water as late as January 2002. Although Shannon claimed they accessed water from a nearby spring to flush the toilet, Bea testified that the toilet was "full of feces" and "it was nasty."
 {¶ 18} With regard to the lack of running water in the Jackson County home, the GAL's testimony revealed that, upon reading the report of a Jackson County Children Services caseworker, she got the impression that there was open sewage outside the home. The GAL's testimony further revealed her belief that, because of the caseworker's findings, Children Services made a referral to the Department of Health.
 {¶ 19} Shannon argues that the Niagara County, New York, Probation Department home investigation reveals that she and Tim "would be able to provide a loving, stable, and safe environment" for Stephen. However, the GAL testified that she had concerns with the Niagara County report. Specifically, the guardian expressed concern that the report focused mainly upon the condition of the Dunn home, without any statements regarding the investigator's observation of the interaction of the family members. With regard to the condition of the house, the investigator noted that the house was small and the bedrooms were small. The investigator claimed that the house had a full basement. However, Shannon testified that it did not. This inconsistency could reasonably have caused the trial court to question the thoroughness and credibility of the investigator's report.
 {¶ 20} The report also indicates that the investigator found the house to be cluttered. However, the investigator appeared to excuse the clutter because the Dunns had only recently taken up residence, and because the previous tenant allegedly left some of her belongings behind. The investigator found the back yard to be littered with trash and lacking grass. At the time of the investigation, there were also two dogs in the back yard, one of which the investigator noted was aggressive. Shannon testified that the house was no longer cluttered, the yard was clean, and the dogs were gone. In support of her testimony, Shannon introduced photographs to demonstrate that the house was no longer cluttered. However, the GAL noted that photos demonstrating the condition of the back yard at the time of the trial were conspicuously absent. Thus, the trial court could reasonably have discounted the credibility of Shannon's statements that the condition of the back yard had been remedied.
 {¶ 21} Despite the investigator's failure to report any observed interaction of the family members, she did state, "[t]he couple appeared to be very loving and caring toward one another and toward their son, whom they have fought tirelessly to regain custody of." However, we note that the investigation took place while Stephen was residing in Ohio with the Karrs, so the investigator could not have observed any interaction between him and the Dunns. The investigator concluded that "Mrs. Dunn and her husband would be able to provide a loving, stable, and safe environment for the minor child, Stephen." The investigator's failure to detail the interactions between the family members, combined with the investigator's apparent confusion as to the identity of the child present in the home during her investigation, could reasonably cause the trial court to question the credibility of the investigator's conclusions.
 {¶ 22} It is also notable that Shannon's husband, Tim, did not make himself available to the GAL during her investigation. Nor did he attend the trial of this matter, either to show his support for his wife, or to demonstrate his commitment to assisting her in her efforts to raise Stephen. While Shannon and her mother-in-law claimed that Tim stayed home to care for their other children, Shannon also acknowledged that they were aware of an outstanding warrant for Tim, arising out of the altercation with Ron. Accordingly, the trial court could reasonably have concluded that Tim's absence and consequent failure to demonstrate a commitment to his wife and Stephen was related to his desire to avoid arrest if he returned to Ohio.
 {¶ 23} Shannon also argues that a September 18, 2002 letter from the New York State Office of Children and Family Services demonstrates that she is a suitable parent for Stephen. The letter states that the agency's investigation determined that a July 12, 2002 report of suspected child abuse or maltreatment was unfounded. However, we note that Stephen was continually in the Karrs' care from July 19, 2002 until well after the date that the agency's investigation concluded. Accordingly, we find that the trial court could reasonably have concluded that the investigation did not adequately review any allegations that may have related to Stephen.
 {¶ 24} Perhaps the most telling demonstration of Shannon's unsuitability relates to her lack of awareness regarding Stephen's numerous medical problems, and her failure to provide him with consistent medical care. Testimony revealed that Stephen has suffered, and continues to suffer from bowel problems, severe dental problems, ear infections, and profound hearing loss in his right ear. He has also suffered from a severe mouth infection.
 {¶ 25} Both Bea and Shannon testified regarding an incident that occurred when Stephen was two months old. Bea indicated that they called a squad because Stephen was turning blue and could not cry. The doctors at Children's Hospital had a difficult time determining what was wrong with Stephen. They apparently concluded that a scalding hot bottle burned his throat. Bea claimed that Shannon gave him the scalding bottle. Shannon, however, repeatedly denied that she gave Stephen the hot bottle, but admitted that she was the one who brought up the fact that Stephen's bottle may have caused the problem. Shannon also admitted to a separate incident, wherein she heated the bottle and gave it to Bea for Stephen's feeding, only to have Bea give it back to her because it was too hot. Accordingly, the trial court could reasonably have concluded that Shannon's testimony regarding the bottle incident was less credible than Bea's testimony.
 {¶ 26} Additionally, Bea testified that Shannon ignored her pleas to take Stephen to the dentist, and when Bea took it upon herself to obtain treatment for Stephen, Shannon failed to provide her with his Medicaid card. Although Shannon testified that she noticed Stephen was having dental problems, she also testified that she informed Bea of the problems, and relied upon Bea to take him to the dentist. Again, when Stephen had a fever, was vomiting, and suffered from a swollen mouth such that he could not cry or eat, Shannon did not seek medical attention. Instead, she took Stephen to Bea, and relied upon Bea to take him to the hospital. Then, when Stephen was released from the hospital, Shannon did not care for him herself. Instead, she left him in Bea's care for a week.
 {¶ 27} On another occasion, Bea testified that Stephen started vomiting while he was in her care for the weekend. Bea sought medical attention at Children's Hospital, where she testified doctors admitted Stephen for four days for constipation and malnutrition. During those four days, Bea testified that she stayed with Stephen the entire time, but that Shannon only came to the hospital once to drop off a bag of toys. According to Bea's testimony, that incident occurred sometime in December. Yet, upon Stephen's release from the hospital, he stayed with the Karrs until March 25th.
 {¶ 28} Bea and the GAL testified regarding a noticeable problem with Stephen's hearing. Bea indicated that, on one occasion, Stephen was talking to her daughter on the telephone when he handed her the phone and said that her daughter was not saying anything. Bea related that she took the phone from Stephen and ascertained that her daughter had been talking the whole time. When she switched the phone from his right ear to his left ear, Stephen continued his conversation. Similarly, the GAL testified that she noticed when she was to the right of Stephen and asked him a question, he would not respond. Yet, when Stephen turned to look at her and she repeated the question, he would answer. Although Stephen's hearing problem was readily apparent to both Bea and the GAL, Shannon testified that she did not realize he had a hearing problem.
 {¶ 29} When Shannon's own attorney questioned her regarding her participation in Stephen's medical care, she indicated that there were times she was unable to attend Stephen's medical appointments. Upon cross-examination, the Karrs' attorney questioned Shannon regarding Stephen's medical appointments on 2/4/02, 2/1/02, 1/21, 1/3/02, 12/14, 12/5/01, where he claimed the hospital records indicated that "only grandma" attended the appointments. When asked if she remembered being present at any of those appointments, Shannon ignored the dates the attorney specifically questioned her about, only to state that she was not aware of appointments that occurred in 2003, when Stephen clearly was not in her care. When the Karrs' attorney acknowledged that he did not expect her to be at any appointments after the Karrs brought Stephen back to Ohio from New York, the only appointment that Shannon indicated that she attended, from those listed, was the dental surgery in January of 2002.
 {¶ 30} Based upon the foregoing, the trial court could reasonably have concluded that Shannon has been inattentive to Stephen's acute medical needs; that she has failed to take an active role in providing for Stephen's medical needs; that she routinely relied upon the Karrs, particularly Bea, to seek medical services for Stephen; and, that she has routinely relied upon Bea to care for Stephen when he was ill.
 {¶ 31} In sum, we find ample competent credible evidence in the record to support the trial court's finding that Shannon Dunn is unsuitable to have custody of Stephen, and that an award of custody to Shannon Dunn would be detrimental to Stephen's well being. Accordingly, we overrule Shannon's sole assignment of error and affirm the judgment of the trial court.
Judgment affirmed.
Abele, J. and Harsha, J.: Concur in Judgment and Opinion.
[2] Although the trial court's Memorandum Decision does not state that it is a judgment entry, we find that it is a final appealable order. See Shaver v. Standard Oil Co. (1990),68 Ohio App.3d 783, 791 (A judgment entry in a civil case is sufficient for the purposes of appellate review if it contains (1) the case caption and number; (2) a designation as a judgment entry, a decision or both; (3) a clear pronouncement of the court's judgment; (4) the judge's signature; (5) a file stamp indicating journalization; and (6) when applicable, a Civ.R. 54(B) determination and Civ.R. 54(B) language. (Citation omitted.))