In re Z.A.P.

[Cite as *In re Z.A.P.*, 177 Ohio App.3d 217, 2008-Ohio-3701.]

Court of Appeals of Ohio,
Fourth District, Washington County.

No. 08CA11.

Decided July 2, 2008.

Burton & Baumgartel, and William L. Burton, for appellant, Jonna Gabbard.
Randall G. Burnworth and Alison L. Cauthorn, for appellee, Debora Wingrove.

HARSHA, Judge.

{¶ 1} Jonna Gabbard appeals the juvenile court's decision awarding custody of her biological son, Z.A.P., to his step-grandmother, Debora Wingrove, and contends that the court applied the wrong legal standard. Gabbard argues that in finding her "unsuitable," the court simply rejected her lifestyle and parenting decisions based upon its own paternalistic view of "societal norms," rather than determining the issue upon the proper basis of whether her behavior had an adverse effect on her son. She also argues that the evidence does not support the court's finding that her retention of custody would be detrimental to her son. However, our review of the record shows that Gabbard failed to file objections to the magistrate's decision with the trial court and thus forfeited all but plain error relating to that decision.

{¶ 2} Nonetheless, the juvenile court applied the proper legal standard when it considered both Gabbard's lifestyle (living in squalor, the lack of a structured and stable environment, and the presence of unsavory live-in companions) and the negative effects it had upon Z.A.P. Likewise, it properly considered Z.A.P.'s happiness and the vast improvement in his behavior and medical conditions that have resulted from his placement with Wingrove. Because these facts support a finding that Gabbard's retention of custody would be detrimental to Z.A.P., we find no error, plain or otherwise, and affirm the trial court's judgment.

## I. The Facts

{¶ 3} Z.A.P. was born on February 24, 1995, and is the natural son of Gabbard and Jeffrey Pike. In March 2007, Wingrove, Z.A.P.'s maternal step-grandmother, filed for legal custody with the Washington County Juvenile Court and received a temporary order placing Z.A.P. in her care. She later filed an amended complaint, and the matter was referred to a magistrate for a hearing. On February 7, 2008, the magistrate issued his decision, including findings of fact and conclusions of law. The following facts are based on the magistrate's decision, which was adopted by the trial court.[1]

---

1. As noted below, we do not have a transcript properly before us due to Gabbard's failure to file objections to the magistrate's decision. Thus, the magistrate's factual findings are

{¶ 4} Z.A.P. was born in North Carolina, where he lived with his mother and father. Gabbard lived at several residences in North Carolina before eventually relocating to Ohio after the child's father was incarcerated. Z.A.P. lived with Gabbard at two residences in Belpre, Ohio, and then several residences in Hamilton County, Ohio. In 2001, she married Kenneth Gabbard, who became a father-figure to Z.A.P., and later she and Gabbard had a son, Alex.

{¶ 5} During the summer of 2005, Gabbard sent Z.A.P. to live with Wingrove. After the summer, Z.A.P. returned to live with his mother in Hamilton County, Ohio. In August 2006, Gabbard again sent Z.A.P. to live with Wingrove. This time it was supposed to be for a year. Gabbard signed a "grandparent power of attorney" and enabled Wingrove to get Z.A.P.'s Social Security disability money, which he was apparently receiving as a result of a disability involving his father. Because she was having marital problems and was busy attending nursing school, Gabbard sent Z.A.P. to live with Wingrove for a year. She also sent Z.A.P.'s half-brother, Alex, to live with Wingrove for a substantial part of 2006 and 2007. Wingrove placed Alex with her sister because she did not think that she could handle both children. In March 2007, after Wingrove made it known that she was planning on seeking custody, Gabbard tried to physically recover Z.A.P. However, Wingrove immediately filed for custody and obtained a temporary order.

{¶ 6} While Z.A.P. resided with his mother, he did not have a "stable and secure home life." Gabbard usually kept the house dirty and in disarray and at different times she had several unrelated people living in the house with her, one of which was described by the local police as a "druggie." The police were called several times to Gabbard's residence; she called the police four times to complain about Z.A.P.'s behavior, and Z.A.P. called the police to complain about Dean Chase, Gabbard's live-in boyfriend. Z.A.P. did not have any real structure within the home, and he was fed fast-food and did not have anyone to help him with his homework. Despite the instability, however, Z.A.P. did have a good relationship with his mother before she sent him away in August 2006.

{¶ 7} Gabbard still resides with Chase, and Z.A.P. is concerned about having to live with him. Z.A.P. accuses Chase of physically hurting him in the past, including punching him, throwing him against a wall, and purposely dropping a heavy toolbox on his leg. The mother's ex-husband is also concerned about leaving his son Alex with Chase and is looking into obtaining child care for Alex so that he does not have to leave him alone with Chase.

---

presumptively correct and we use them here rather than presenting testimony in a narrative form.

{¶ 8} While Z.A.P. was living with his mother, he did not have a good attitude and had serious behavior problems. He was the class clown, a bully at school, and he got into numerous fights. Due to his behavior, Z.A.P. took several medications, including methylphenidate, Adderall, Strattera, Ritalin, Focalin, and Concerta, as well as medications to help him sleep. Since moving in with Wingrove, he has "transformed into a completely different person." He has gone from a "skinny-looking kid into a solidly built young man," but it is not clear if this was caused by better nutrition or if the child had simply hit a growth spurt. His behavior has also undergone a substantial positive change; his grades, attendance, and behavior have dramatically improved, and he no longer requires any medication to help him with his behavior.

{¶ 9} Z.A.P. is concerned about having to live with his mother again. He is afraid that if he goes back into that unstable environment he will lose everything positive that he has gained, his behavior will regress, and he will again require medication to control his behavior. Gabbard agrees that Z.A.P. will require a substantial amount of counseling to get him to want to live with her again. Z.A.P. has a very close relationship with Wingrove and his grandfather, Rod Wingrove. Rod Wingrove participates in lots of activities with the child, including helping him with his homework, Boy Scouts, hunting, four-wheeling and spending time at the farm. Z.A.P. has bonded with a group of friends who live near Wingrove's residence and enjoys going to school from her home.

{¶ 10} Z.A.P. indicated that he wants to live in Wingrove's home, where he has thrived in the structure and attention that he has received there. Finally, Z.A.P.'s guardian ad litem ("GAL") performed an extensive investigation in this case and concluded that it was in Z.A.P.'s best interest that he be placed with Wingrove.

{¶ 11} After considering all of the evidence, the magistrate concluded that Z.A.P. will be "emotionally devastated" if he is returned to his mother's custody. The magistrate specifically found that the GAL's report notes that Z.A.P. "totally broke down" crying in front of his principal because he is worried about the court making him live with his mother.[2] The magistrate also concluded that Gabbard has failed to provide her son with a stable and structured environment, noting that she had lived in numerous different locations with him and twice sent him away for long periods of time. The magistrate contrasted Gabbard's unstable environment with the fact that Z.A.P. is currently "thriving physically, mentally and emotionally in the stable environment that [Wingrove] has provided." The

---

2. Neither side has contested the court's apparent substantive use of the GAL's report. But see *In re Hilyard,* Vinton App. No. 05CA630 through 05CA639, 2006–Ohio–1977, 2006 WL 1045504, ¶ 53 et seq.

magistrate also noted that witnesses described Gabbard as "the world's worst housekeeper" and that Z.A.P. did not have a clean home in the mother's house, contrasting that with the fact that Z.A.P. now "takes pride in keeping his room at [Wingrove's] house clean." Finally, the magistrate concluded that Z.A.P. does not feel safe living in his mother's home with Chase, who he has accused of committing several acts of violence against him.

{¶ 12} Therefore, the magistrate concluded that Wingrove proved by a preponderance of the evidence that it would be detrimental to Z.A.P. to remain with Gabbard because she is an unsuitable parent. The decision granting Wingrove's request for custody stated:

A party may, pursuant to Rule 40(E)(3)(a) of the Ohio Rules of Juvenile Procedure, file written objections to a magistrate's decision within fourteen days of the filing of the decision, regardless of whether the court has adopted the decision pursuant to Juv.R. 40(E)(4)(c). Objections shall be specific and state with particularity the grounds of the objection. A party shall not assign as error on appeal the court's adoption of any finding of fact or conclusion of law unless the party timely and specifically objects to that finding or conclusion as required by Juv.R.(40)(E)(3).[3]

{¶ 13} In an entry dated that same day, the trial court adopted the magistrate's decision and granted Wingrove legal custody of Z.A.P. The trial court did not issue separate findings of fact and conclusions of law, but rather adopted the magistrate's decision in its entirety. Neither party filed objections to the magistrate's decision.

{¶ 14} Gabbard now appeals and contends that the trial court erred in granting Wingrove's motion for custody.

## II. Lack of Objections/Plain Error

{¶ 15} Initially, we must address Wingrove's contention that Gabbard failed to file objections to the magistrate's decision and thus waived all errors relating to that decision, except plain error. Juv.R. 40(D)(3)(b)(i) requires a party to file written objections to the magistrates decision within 14 days. If no one files objections, the court may adopt a magistrates decision, unless it

---

**3.** Juv.R. 40(D)(3)(a)(iii) requires that a magistrate's decision include conspicuous language informing the parties that "a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Juv.R. 40(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Juv.R. 40(D)(3)(b)." The magistrate's decision actually cites Juv.R. 40(E)(3), the former rule concerning waiver, which was superseded by Juv.R. 40(D)(3)(b)(iv), effective July 1, 2006. We note, however, that Gabbard does not claim on appeal that she was not properly apprised, as required under the rules, of the procedural rules for filing objections.

determines that there is an error of law or other defect evident on the face of the magistrates decision. See Juv.R. 40(D)(4)(c). Juv.R. 40(D)(4)(e)(i) allows the court to enter judgment within the 14–day period, but the timely filing of objections operates as an automatic stay until the court disposes of those objections. Juv.R. 40(D)(3)(b)(iv) provides that "[e]xcept for plain error, a party shall not assign as error on appeal the court's adoption of any finding of fact or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Juv.R. 40(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b)." Thus, the failure to file written objections challenging a finding of fact or conclusion of law precludes a party from assigning as error on appeal the court's adoption of that finding or conclusion, absent plain error. "The waiver under [former] Juv.R. 40(E)(3)(b) embodies the long-recognized principle that the failure to draw the trial court's attention to possible error, by objection or otherwise, when the error could have been corrected, results in a waiver of the issue for purposes of appeal." *In re Etter* (1998), 134 Ohio App.3d 484, 492, 731 N.E.2d 694. The plain-error doctrine is applicable in civil cases only where the error "seriously affects the basic fairness, integrity, or public reputation of the judicial process." *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 122–123, 679 N.E.2d 1099.

{¶ 16} Our review of the record shows that the magistrate issued his decision, and the trial court adopted the decision that same day. Thereafter, neither party filed objections to the magistrate's decision. Accordingly, Gabbard's failure to object to the magistrate's decision prevents her from raising assignments of error related to that decision, other than as plain error.

### III. Is Gabbard "Unsuitable"?

{¶ 17} In her sole assignment of error, Gabbard contends that the trial court abused its discretion by finding that she is an unsuitable parent and that it would be detrimental to her son to allow her to retain custody.

### A. Standard of Review

{¶ 18} A trial court has broad discretion in determining custody matters. *Reynolds v. Goll* (1996), 75 Ohio St.3d 121, 124, 661 N.E.2d 1008. Consequently, we can sustain a challenge to a trial court's custody decision only upon a finding that the trial court abused its discretion. *Davis v. Flickinger* (1997), 77 Ohio St.3d 415, 418, 674 N.E.2d 1159. An abuse of discretion connotes more than an error of law or judgment; rather, it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. When applying an abuse-of-discretion standard, we are not free to merely substitute our judgment for that of the trial court. *In re Jane Doe 1* (1991), 57 Ohio St.3d 135, 137–138, 566 N.E.2d

1181. A deferential review in a child-custody case is appropriate because much may be evident in the parties' demeanor and attitude that does not translate to the record well. *Davis,* 77 Ohio St.3d at 419, 674 N.E.2d 1159.

### B. Custody Disputes Involving a Nonparent

{¶ 19} It is undisputed that the right of a parent to raise her own child is an essential and basic civil right. *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169, citing *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551. Thus, natural parents have a paramount right, as against third parties, to custody of their children. *Murray,* supra; *Clark v. Bayer* (1877), 32 Ohio St. 299, 310. This right, however, is not absolute. See *In re Kovaleski,* Washington App. No. 05CA12, 2006–Ohio–317, 2006 WL 199549, at ¶ 14, citing *In re Johnson* (Mar. 29, 1995), Ross App. No. 94CA2003, 1995 WL 146064. In a custody proceeding under R.C. 2151.23(A)(2) between a parent and a nonparent, the court may not award custody to the nonparent without first determining that the parent is unsuitable to raise the child, i.e., without determining by a preponderance of the evidence that the parent abandoned the child or contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child. *In re Perales* (1977), 52 Ohio St.2d 89, 6 O.O.3d 293, 369 N.E.2d 1047, at syllabus. If a trial court's "unsuitability" finding is based on detriment to the child, the court must measure suitability in terms of the harmful effect on the child, not in terms of society's judgment of the parent. *In re Dunn* (1992), 79 Ohio App.3d 268, 271, 607 N.E.2d 81, citing *Perales* at ¶ 98.

### C. Findings of Fact

{¶ 20} Gabbard challenges the accuracy of certain factual findings. For example, she argues that the "year" that she sent Z.A.P. to live with Wingrove was actually only seven months because she attempted to take him from Wingrove upon learning that she was filing for custody. She also argues that the magistrate's finding that Kenneth Gabbard does not want to leave his son, Alex, alone with Chase ignores Kenneth Gabbard's testimony that despite his apparent dislike of Chase, he has in fact dropped off Alex to Gabbard's house for visitation for over a year. And she argues that the magistrate's finding that the child had a bad attitude while living with her, including being "the class clown, a bully at school, and getting into numerous fights," is incorrect.

{¶ 21} Under Juv.R. 40(D)(3)(b)(iii), a party objecting to a magistrate's factual finding is required to support the objection with a transcript of all the evidence submitted to the magistrate relevant to that finding. The trial court

may properly adopt a magistrate's factual findings without further consideration when the objecting party fails to provide the court with a transcript of the magistrate's hearing or other relevant material to support their objections. *In re Maxwell*, Ross App. No. 05CA2863, 2006–Ohio–527, 2006 WL 290292, at ¶ 27, citing *Proctor v. Proctor* (1988), 48 Ohio App.3d 55, 60, 548 N.E.2d 287, in turn citing *Purpura v. Purpura* (1986), 33 Ohio App.3d 237, 515 N.E.2d 27.

■■ {¶ 22} The fact that Gabbard failed to file objections at the trial level and failed to provide the trial court with a transcript or affidavit precludes us from considering the transcript she has submitted in this appeal. See *Maxwell*, 2006–Ohio–527, 2006 WL 290292, at ¶ 28, citing *Lincoln S. & L. Assn. v. Damron*, Lawrence App. No. 02CA4, 2003–Ohio–2596, 2003 WL 21152844. See also *State ex rel. Duncan v. Chippewa Twp. Trustees* (1995), 73 Ohio St.3d 728, 730, 654 N.E.2d 1254. "This is because appellate courts will not take into consideration evidence not presented before the trial court." *Maxwell*, citing *Unger v. Reams* (Aug. 6, 1993), Lake App. No. 92–L–116, 1993 WL 317448. Furthermore, "[w]hen portions of the record necessary for the determination of an assigned error are absent, the reviewing court has nothing to pass on and has no choice but to presume the validity of the trial court's proceedings." *Lincoln* at ¶ 27, citing *Metzger v. Metzger* (Aug. 21 1989), Crawford App. No. 3–87–39, 1989 WL 94813.

{¶ 23} Without the transcript properly before us, we simply have no basis to conclude that the trial court erred in adopting the magistrate's factual findings. To the extent that Gabbard's assignment of error is based on challenges to the factual findings, we must presume the validity of the trial court's proceeding and reject her contention that the trial court erred in adopting the magistrate's decision. Accordingly, we will limit our review to determining whether the trial court's judgment was based on the correct legal standard and whether the factual conclusions in the magistrate's decision supported the trial court's judgment that she was unsuitable.

### D. Application of *In re Perales*

■ {¶ 24} Here, the trial court found that Gabbard is an unsuitable parent because her retention of custody would be detrimental to the child. Gabbard now contends that the trial court applied the wrong legal standard when it determined that she is an unsuitable parent. She acknowledges that "on its face" the magistrate's decision set forth the proper standard; yet, she claims that "the trial court's reasoning demonstrates it engaged in a judgment of [Gabbard] based upon societal norms." She refers us to portions of the magistrate's decision that comment upon her poor housekeeping, her decision to temporarily place her children with Wingrove, and her relationship with Chase as indicators of the magistrate's use of an improper analysis. Specifically, she points to the magis-

trate's findings that she "has a history of sending her children to live with others for long periods of time when it is convenient for her" and that "[w]hile it may have been beneficial for the mother not to have to deal with her children for a year, it certainly creates bonding and stability problems for the child to be moved between caretakers." She also points to the magistrate's finding that she was described by the witnesses at trial as "the world's worst housekeeper."

### 1. Societal Norms or Adverse Impacts?

{¶ 25} Our review of the magistrate's decision shows that the magistrate cited the proper legal standard set forth in *Perales* and also specifically stated: "When courts determine parental unsuitability based upon detriment to the child, the courts must measure unsuitability in terms of the harmful effect on the child, not in terms of society's judgment of the parent. *In re Dunn* (1992), 79 Ohio App.3d 268, 271, 607 N.E.2d 81; *In re Perales*, (1977), 52 Ohio St.2d 89, 98, 369 N.E.2d 1047." In support of the conclusion that the mother had failed to provide Z.A.P. with a stable and structured environment, the magistrate made several findings, including the findings that Gabbard now contends reflect a judgment based on societal norms. However, we conclude that the magistrate applied the correct legal standard, i.e., analyzing "unsuitability" in terms of the harmful effects that Gabbard's behavior and the environment she provided had on Z.A.P.

{¶ 26} There are several factual findings supporting the conclusion that the magistrate considered the effect of the conditions he noted, rather than simply concluding that Gabbard is an unsuitable parent because he did not approve of her lifestyle. The magistrate found that Z.A.P. would be "emotionally devastated" if he was required to live with Gabbard. While living with Gabbard, Z.A.P. had "serious behavior problems" and was required to take several medications to control his behavior and to help him sleep. The magistrate also found that now that Z.A.P. is no longer living with Gabbard, he is "thriving physically, mentally and emotionally." The magistrate concluded that Z.A.P. "transformed into a completely different person" after leaving Gabbard's home; his behavior "dramatically improved," and he no longer requires any medication to help him with his behavior. He also noted that Z.A.P. does not want to live with Gabbard and is in fact afraid to go back into the unstable environment she provided; Z.A.P. actually "totally broke down" crying in front of his school principal because he is worried about the court making him live with his mother. And the magistrate found that Gabbard had lived at several different locations and at different times had several unrelated individuals living with her; and she had twice sent Z.A.P. to live with Wingrove for extended periods of time. These findings are relevant in determining the harmful effects that her failure to provide a stable home environment had on Z.A.P.

{¶ 27} While the mere existence of an unclean home or other lifestyle choices may not in isolation form the basis for finding unsuitability, the court could nonetheless consider the harmful effects that constantly moving, living in squalor, and the absence of structure or attention had on Z.A.P. While the magistrate may have offered his own editorial comments about Gabbard's decision to place Z.A.P. with Wingrove, stating that she did so "when it [was] convenient" or "beneficial" to her, the underlying considerations were nonetheless proper.

### 2. Gabbard's Custody Is Detrimental

{¶ 28} Gabbard contends that the evidence fails to show that her retaining custody would be detrimental to the child. She argues that the trial court simply determined that Wingrove provided a better environment for Z.A.P. Notwithstanding Z.A.P.'s desire to live with Wingrove, Gabbard contends that the evidence was insufficient to deprive her of her fundamental interest in raising her son. In support of this contention, she challenges the weight to be afforded certain factual findings.[4]

{¶ 29} Gabbard has failed to provide Z.A.P. with a "stable and structured environment" or a "secure home life." While living with his mother, Z.A.P. lived at numerous locations, including several in North Carolina, two in Belpre, Ohio, and then several in Hamilton County, Ohio. At different times while Z.A.P. resided with her, Gabbard had several unrelated people living in the house with her, including one person who police described as a "druggie." And the police had to respond numerous times to Gabbard's residence when Z.A.P. was living with her. Moreover, Z.A.P. does not feel safe living in his mother's home with Chase, whom Z.A.P. accuses of physically hurting him several times in the past. While in Gabbard's care Z.A.P. had no stability, no structure, and lacked proper guidance. He suffered from various medical disorders, which have disappeared after his placement with Wingrove.

{¶ 30} These facts support the trial court's judgment that it would be detrimental to Z.A.P. for Gabbard to retain custody and that she is therefore an unsuitable parent. Contrary to Gabbard's contentions, we do not believe that the facts merely demonstrate that Wingrove has provided a better environment for the child; nor do they demonstrate that the trial court gave undue consideration to Z.A.P.'s wishes to remain in Wingrove's home. Rather, we believe that they sufficiently demonstrate the harmful effects her custody would have on Z.A.P. Specifically, the factual findings demonstrate the negative physical, mental, and emotional effects that Gabbard's custody previously had on Z.A.P., and they

---

4. To the extent she would challenge the accuracy of these factual findings, we have already rejected that contention above. See § III. C.

further show that since leaving Gabbard's home, Z.A.P. has undergone dramatic positive changes concerning his behavior, health, happiness, attitude, social skills, and school grades and attendance. He is now "thriving physically, mentally and emotionally" and no longer requires medication to control his behavior. The record clearly contains a rational basis to support the finding that retention of custody by Gabbard would have harmful effects on Z.A.P. This is especially so where his desire to remain in Wingrove's home is based in part on that fact that he is afraid to live in that unstable environment and does not feel safe living with Chase.

## IV. Conclusion

{¶ 31} Because the trial court's judgment was based on the proper legal standard and because the magistrate's factual findings provide an evidentiary basis for the trial court's finding that it would be detrimental to Z.A.P. for Gabbard to retain custody, there is no error, plain or otherwise. We overrule Gabbard's sole assignment of error.

Judgment affirmed.

ABELE, P.J., and MCFARLAND, J., concur.