[Cite as *In re B.P.*, 191 Ohio App.3d 518, 2010-Ohio-6458.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ADAMS COUNTY

| | | |
|---|---|---|
| In re B.P.; | : | Case No. 10CA890 |
| Purvis, et al., | : | |
| Appellee, | : | <u>DECISION AND</u><br><u>JUDGMENT ENTRY</u> |
| v. | : | |
| Hazelbaker, | : | **Released 12/22/10** |
| Appellant. | : | |

_____

<u>APPEARANCES</u>:

Kris D. Blanton, for appellees Debra and Keith Heaton.

Lauren R. Weller, Southeastern Ohio Legal Services, for appellant.

_____

Per Curiam.

**{¶ 1}** After finding Robin Hazelbaker to be an "unsuitable" parent, the Adams

County Juvenile Court awarded legal custody of her daughter, B.P., to the child's

paternal grandparents, Debra and Keith Heaton.[1] Hazelbaker argues that the trial court

---

[1] The trial court's entry refers to the grandparents "retaining" custody rather than custody being "awarded" to them. Previously, the trial court had awarded custody to the grandparents, but we reversed this decision after concluding that the trial court applied the wrong legal standard. *Purvis v. Hazelbaker*, 181 Ohio App.3d 167, 2009-Ohio-765, 908 N.E.2d 489. Upon remand, the trial court granted the grandparents' request to retain custody of B.P. pending the court's redetermination of the custody dispute between the Heatons and Robin Hazelbaker. We assume that this procedural history is the basis for the trial court's use of the word "retaining" rather than "awarding" when the court reexamined the issue. Thus, the effect of the court's most recent entry was to grant custody to the grandparents, and we refer to the trial court's decision as an award of custody.

abused its discretion because the record lacks competent and credible evidence to support its finding that her retention of custody would be detrimental to the child.

{¶ 2}   For various reasons, Hazelbaker contends that the following findings of fact do not justify the court's conclusion that she is an unsuitable parent: (1) she withheld B.P. from visiting with the Heatons on a number of occasions,; (2) she was alienated from her other three children, (3) the Heatons provided B.P. a "safe and stable" home; (4) she was unable or unwilling to provide B.P. with a safe and stable home; and (5) she had several boyfriends and allegedly sent nude photographs of herself to one of them.

{¶ 3}   Our decision here is guided by the "unsuitability" analysis set forth in *In re Perales* (1977), 52 Ohio St.2d 89, 369 N.E.2d 1047.  Under *Perales*, a court may not change custody from a parent to a nonparent without first finding that retaining custody in the parent would be detrimental to the child, i.e., the parent is "unsuitable."  Id. at syllabus.[2]  After reviewing the record, we agree that some of the court's findings of fact are not relevant to the unsuitability analysis.  The findings of fact related to the Heatons' "safe and stable" home are potentially relevant in a "best interest" type analysis but not to an "unsuitability analysis.  We also conclude that the trial court erred to the extent it premised its finding of unsuitability on Hazelbaker's pattern of romantic relationships and sending nude photographs to a former boyfriend.  There is no evidence in the record establishing that B.P. has or is about to suffer any detriment because of her mother's sexual conduct.  And finally, there is some evidence supporting the trial court's

---

[2] We note that under *Perales*, parental unsuitability may also be established if the court finds that the parent has (1) abandoned the child, (2) contractually relinquished custody of the child, or (3) become incapable of supporting or caring for the child.  However, none of these additional findings establishing unsuitability are relevant in this appeal.

findings that Hazelbaker prevented B.P. from visiting the Heatons for a period of time and that Hazelbaker is alienated from her adult children. However, these two factors alone do not demonstrate that it would be detrimental for Hazelbaker to retain custody of her daughter. Consequently, we agree that the trial court abused its discretion when it found that Hazelbaker was an unsuitable parent.

## I.  Background

### A.  Events Leading Up to the Custody Dispute

{¶ 4}   B.P. was born in 2000 and is the natural daughter of Robin Hazelbaker and Michael Purvis. The couple lived together for some period of time, but they were never married and eventually separated in April 2005. Purvis filed a complaint in April 2006 to establish child support and a parent-child relationship. However, he was subsequently incarcerated and failed to pursue his petition.

{¶ 5}   In May 2006, the Heatons, Purvis's mother and stepfather, filed a motion for grandparental visitation. Hazelbaker, acting pro se, and the Heatons, who were represented by counsel, later reached an agreement on the "motion for grandparents rights." The agreed entry stated: "The Defendant and grandparents have agreed to share in the parenting of the child. Defendant, Robin Hazelbaker shall retain custody of the minor child. Keith and Debbie Heaton shall have visitation with the minor child every weekend or as agreed upon by the parties."

{¶ 6}   Purvis was released from prison in October 2006 and began living with the Heatons. In November 2006, the Heatons filed a motion seeking custody of B.P., claiming that Hazelbaker was "unfit" to care for the child. On the same day, Hazelbaker filed a petition for a civil stalking protection order against Purvis on behalf of herself and

B.P. After filing for the protection order, Hazelbaker stopped sending B.P. to visit the Heatons. In December 2006, the Heatons filed a motion for contempt, arguing that Hazelbaker had withheld visitation with B.P. from them.

{¶ 7} In December 2006, the court held a hearing on Hazelbaker's petition for a protection order. Although the Heatons were not a party to the civil-protection-order proceeding, the Heatons and Hazelbaker apparently came to a temporary agreement so that the Heatons would have visitation with B.P. over the Christmas holiday. Later, the court granted Hazelbaker's request for a protection order for herself, but denied a request that B.P. remain a protected party under the protection order.

## B. The Initial Hearing

{¶ 8} In January 2007, an initial hearing on the Heatons' custody and contempt motions occurred. In February 2007, the court issued an"agreed entry granting the Heatons visitation with B.P. every other Sunday. The court also appointed a guardian ad litem for the case. Then, in April 2007, Purvis filed a new motion for custody and visitation. The court, upon the guardian ad litem's recommendation, modified the February 2007 agreed entry and granted additional visitation to Purvis and the Heatons.

{¶ 9} Later, the guardian ad litem filed two reports with the court, the first of which recommended that the court order psychological and/or custody evaluations of the interested parties. In the second report, the guardian ad litem described custody interviews with Hazelbaker and Purvis. She stated that she had concerns about Purvis's criminal background and Hazelbaker's mental stability. Notably, she said that both the Heatons' home and Hazelbaker's home were "appropriate and suitable" for the

child.  Ultimately, the guardian ad litem recommended that Hazelbaker and Purvis be awarded shared parenting of B.P.

{¶ 10} Dr. Eugene Smiley, a professional counselor, conducted the custody evaluations of Purvis and Hazelbaker and filed a report with the court.  Purvis told Dr. Smiley that Hazelbaker was "promiscuous" and that all she did was "smoke and drink beer."  Hazelbaker accused Purvis of being violent, volatile, and unstable.  She also claimed that Purvis and the Heatons had made unfounded complaints to Adams County Children Services, apparently in an attempt to gain custody of B.P.

{¶ 11} Dr. Smiley wrote that he was concerned that both Hazelbaker and Purvis exhibited "conflicted" behavior toward one another, which was having a negative effect on B.P., who was "clearly and equally" bonded to both parents.  He believed that Purvis would benefit from anger-management courses and recommended them.  Dr. Smiley also stated that he contacted Adams County Children Services and confirmed that they had conducted investigations at Hazelbaker's home.  They found all claims to be unsubstantiated.  Ultimately, he recommended that Hazelbaker retain custody of B.P. and that Purvis have alternating weekend visitation with her.

{¶ 12} Dr. Smiley later filed an addendum report after interviewing the Heatons and Heather Hazelbaker, who is one of Hazelbaker's older daughters from a prior marriage.  Heather was 17 years old at the time of the interview in 2007 and in the custody of Hazelbaker's ex-husband, Frank Hazelbaker.  Dr. Smiley found that Heather was "clearly alienated" from her mother.  Heather told Dr. Smiley that when she was living with Hazelbaker, as many as ten people were staying in the small house." She also claimed that her mother had posted hundreds of nude photographs of herself on

the Internet.  Heather described Hazelbaker as a "lying, cheating person who has done horrible stuff."  Dr. Smiley noted that Heather could not think of one positive thing to say about her mother, but that if the allegations were true, then Hazelbaker would "be well advised to take more care in her choice of male and other companions, and to exercise more discretion when determining who resides in her home with [B.P.]"

{¶ 13} The Heatons told Dr. Smiley that they were concerned about B.P.'s welfare while she was being raised by Hazelbaker.  They claimed that they were concerned for her "safety, direction and support, and exposure to individuals that have come into contact with [B.P.]'s home that do not meet with [their] approval."  Additionally, they claimed that Hazelbaker had not allowed B.P. to participate in activities "outside her mother's home – no extracurricular school or church activities."  After observing B.P. with the Heatons, Dr. Smiley noted that B.P. exhibited "a positive and comfortable bond" with them.

{¶ 14} Dr. Smiley again stated that he was concerned about the conflicts between Purvis and Hazelbaker and that these would have a negative impact on B.P.  He also noted that B.P. had a lack of contact with her three older siblings, Elisha, Nathan, and Heather.  Ultimately, Dr. Smiley changed his recommendation to a shared parenting arrangement between Hazelbaker and the Heatons.

{¶ 15} Dr. Smiley also filed a third addendum to his recommendations after realizing that he had forgotten to mention Purvis's status.  This clarification recommended that the Heatons should have shared parenting rights with the understanding that while B.P. was with the Heatons, Purvis would have full and unsupervised visitation with B.P.

C.  Subsequent Hearing

{¶ 16} In late 2007 and early 2008, the court conducted a two-day hearing to resolve the pending motions.  First to testify was Dr. Smiley, who reiterated many of the opinions in his custody evaluations, including his recommendation that the Heatons and Hazelbaker have shared parenting of B.P. and that Purvis be allowed unsupervised contact with B.P. while she was staying with the Heatons.  Dr. Smiley stated that he had no concerns for either Purvis's or Hazelbaker's mental state as it related to their ability to parent.  Dr. Smiley opined that Heather Hazelbaker came across as too "one-sided" but that he did not necessarily believe that she was lying about or exaggerating her claims.

{¶ 17} Frank Hazelbaker testified that he was Hazelbaker's ex-husband and, after their divorce in the late 1990s, he obtained custody of two of their children, Elisha (the oldest) and Nathan (the youngest).  He later gained custody of Heather, their middle child, in March 2007.  Frank stated that Hazelbaker had visitation rights with Nathan but had not exercised them.

{¶ 18} Elisha explained that she lived at her mother's house for about nine months beginning in the summer of 2005.  She claimed that her mother would often leave her, and she was forced to babysit the children in the house while Hazelbaker "went out."  She claimed that her mother would ask her for money and then leave the house.  Elisha claimed that Hazelbaker "slept all the time" and that there was never any healthy food in the house.  Elisha also stated that she had concerns about the individuals that Hazelbaker was bringing in to the house and claimed that in the nine-

month period when she was staying at Hazelbaker's, she brought home four to five men.  She stated that she never observed any drug use in the home.

{¶ 19} Nathan testified that he was mad at his mother because she had placed Heather in a children's home.  Nathan very rarely visited Hazelbaker's home and never observed any drug use in the home.  He claimed that when he would visit, he would sometimes see men there.  He was asked whether Elisha ever had to babysit him when he visited, and he said that she "infrequently" babysat him.  Nathan testified that he had no concerns about his mother's interactions with B.P.

{¶ 20} Heather supplied the most damaging testimony against her mother.  She testified that Hazelbaker was doing a lot of dating while she lived at the house and that there were "plenty of men" there.  She claimed that sometimes she would go into the living room at night and find strange men there.  She also stated that there was an inadequate supply of food and that her mother would bring home wine instead of food when she was depressed.  She claimed that her mother drank alcohol "all the time." She stated that the house has no heat and no air conditioning.  Heather accused her mother of trying to put her in a children-services home because she wanted to be placed in her father's custody.

{¶ 21} Heather claimed that she witnessed violence between Hazelbaker and her boyfriend, Kevin Hesler.  She stated that police would "often" come to the house.  She also stated that she witnessed her mother smoking marijuana with Hesler in the home. Heather claimed that she found one thousand sexually explicit photographs, which were freely accessible, on a computer in her mother's home.  She explained that the computer had separate accounts for everyone at the home; however, the password for

each account was the same. Heather stated that she found the photographs in a shared pictures folder and that there were no access restrictions on the photographs. She claimed that in certain photographs, her mother was nude, standing by a Christmas tree in the living room. Her mother's boyfriend at the time, who was a soldier in Iraq, appeared nude in a different photograph. She also claimed that there were pictures of "naked parties" in which Hazelbaker was engaged in sexual acts with boyfriends and "different guys." Heather stated that B.P. used this computer although she did not indicate that B.P. had viewed the photographs.

{¶ 22} Heather explained that she transferred these photographs to five compact discs ("CDs") and that there were about 200 photographs contained on each CD. She claimed that she gave the CDs to her mother but later found one of them on her mother's desk. She turned this CD over to the Heatons, apparently to help them secure custody of B.P. Although the Heatons claimed that they had possession of the photographs on the CD, they did not introduce them into evidence.

{¶ 23} Heaton told the court about her large house, which sat on 300 acres and had six bedrooms and a pool. Mrs. Heaton told the court that she had frequent interactions with B.P. through weekend visitations between when the child was two weeks old and October 2006. When B.P. was with them on the weekends, the Heatons took her to 4-H classes and to Sunday school.

{¶ 24} Mrs. Heaton testified that Hazelbaker was "paranoid" and would not leave the house. She claimed that Hazelbaker slept a lot and had "questionable seizure activity." Mrs. Heaton opined that B.P.'s future would go "nowhere" if she stayed with Hazelbaker. And Mrs. Heaton stated that while B.P. was staying with her one weekend,

the Adams County Sheriff was called to Hazelbaker's residence twice. She also stated that in 2006, Purvis had to watch B.P. for two weeks when Hazelbaker took a trip to Paris, France, with a boyfriend who was a soldier in Iraq.

{¶ 25} Purvis testified that he had concerns about Hazelbaker's having custody of B.P. because she was "unpredictable." Purvis admitted that he was on probation in Brown County for three years for a theft conviction, that he was on probation in Adams County for one year for a charge of theft by deception, and that he had been incarcerated for a parole violation for a theft conviction in Highland County.

{¶ 26} On the second day of the hearing, the court heard testimony from Hazelbaker and her witnesses. Steve Darby testified that he is a guidance counselor at North Adams High School and the advisor of a 4-H group at the school. Darby testified that Heather attended 4-H meetings, and Hazelbaker brought her to the meetings when they resided together. He further testified that Hazelbaker brought B.P. with her to the meetings, that B.P. would play with the siblings of other 4-H participants, and that Hazelbaker and B.P. had a good relationship. Finally, Darby testified that B.P. participated in Lead Line classes at horse shows.

{¶ 27} Winfield Rayburn, Hazelbaker's father, testified that he would babysit B.P. after she got out of preschool or kindergarten and before Hazelbaker came home from work. Winfield testified that B.P. was a pleasant and talkative child. Winfield stated that he had no concerns about the way that Hazelbaker was raising B.P.

{¶ 28} Hazelbaker testified that she worked at Child Focus, Inc., where she coordinated services for at-risk families with young children. Hazelbaker indicated that her workplace required random drug tests and that she had never failed a drug test.

She specifically denied ever taking any drugs.  She claimed that there were never any "strange men" in the house and denied that she slept all the time.  She denied using Elisha as a babysitter so that she could go out to the bars; she said that she rarely if ever went out.  Hazelbaker also stated that the house had heat and air conditioning.

{¶ 29} Hazelbaker testified that B.P. had good grades while living with her. Hazelbaker stated that she took B.P. to 4-H classes in Adams County and that she took her to Lead Line horse riding classes.  She produced various photographs showing B.P. participating in Lead Line classes, at home with her sisters, and on vacation with her at the Great Serpent Mound.

{¶ 30} Concerning the nude photographs, Hazelbaker conceded that she sent pictures taken in 2005 to a soldier stationed in Iraq whom she met online.  Hazelbaker claimed that she kept the pictures under a password-protected account and denied that all the accounts on the computer had the same password.  Hazelbaker also denied that there were photographs on her computer of group sex and claimed no recollection of those events.  Hazelbaker stated that she believed that Heather was angry at her because she attempted to place her in a children's home after she suspected that Heather had a drug problem.

{¶ 31} Hazelbaker admitted that Adams County Children Services had been called to her house at least five times.  She believed that Purvis and/or the Heatons had called them.  She noted that Children Services investigated all the claims and found that none were substantiated.  Hazelbaker admitted that she filed bankruptcy in 2007 and had 63 total creditors.  However, she pointed out that 49 of these creditors were for a failed construction business with Purvis.  Hazelbaker also admitted that she called the

sheriff's office out to her home twice one weekend in 2006 because of a domestic dispute between Hesler and herself.

{¶ 32} Hazelbaker explained that she kept B.P. from visiting with the Heatons one weekend because she had family coming into town from Alabama and she wanted them to meet B.P.  She indicated that she had asked the Heatons if she could keep B.P., but they refused.  She also admitted that she kept B.P. from visiting with the Heatons for approximately two months after she obtained a protection order against Purvis.  However, she claimed that she kept B.P. upon the advice of the sheriff's office, which informed her that as long as the protection order was in effect, she should not send B.P. to stay with the Heatons while Purvis was living with them.

{¶ 33} In June 2008, the court issued its decision, effectively granting custody to the Heatons and parenting time to Hazelbaker.  After Hazelbaker appealed that decision, we reversed, holding, among other things, that the court must find that Hazelbaker was "unsuitable" before it could grant custody of B.P. to the Heatons.  See *Purvis v. Hazelbaker*, 181 Ohio App.3d 167, 2009-Ohio-765, 908 N.E.2d 489, at ¶ 2.

### D.  Remand Proceedings

{¶ 34} In April 2009, the court held a hearing after our remand, apparently to receive any new evidence that had arisen since the 2008 hearing.  Ty Shipley testified that he was engaged to Hazelbaker, whom he had known for 20 years.  Hazelbaker had been living with him at his home since December 2008, and B.P. had made overnight visits to his residence during Hazelbaker's parenting time.  Shipley testified that he had observed the relationship between Hazelbaker and B.P. and it was "typical" and "good." Shipley stated that he has grown children of his own.

**{¶ 35}** Hazelbaker testified that B.P. has a good relationship with Shipley and that they play soccer together. She stated that there had been no police or children-services investigations at Shipley's home. Hazelbaker admitted that she had lost the home that she was living in previously to foreclosure. She stayed at her father's home for a few months before moving in with Shipley. Before she moved there, she had been in a relationship with another man for approximately three months. Their relationship ended because he died in a car accident. Hazelbaker stated that she had very little contact with the Heatons, and most of the information regarding what B.P. was doing with them was obtained through Purvis.

**{¶ 36}** Subsequently, the guardian ad litem issued an additional report. She found that B.P. was doing well in school and continued to thrive while in the Heatons' care. B.P. was participating in softball and going to church camp. The Heatons told the guardian ad litem that Hazelbaker had been resistant to extracurricular activities involving B.P. They claimed that Hazelbaker had brought the child to softball practice but left early, after about 45 minutes, because B.P. was not feeling well. The Heatons reported that exchanges of B.P. with Hazelbaker had been uneventful. Ultimately, the guardian ad litem recommended that the court grant custody of B.P. to the Heatons and opined that custody by either parent would be detrimental to B.P.

**{¶ 37}** The court issued its decision in September 2009 and found by "clear and convincing" evidence that Hazelbaker was not a suitable parent and that her retaining custody of B.P. would be detrimental to the child. Accordingly, the court ordered that custody of the child "should remain with the grandparents, Keith and Debbie Heaton."

After Hazelbaker requested findings of fact and conclusions of law, the court delayed

issuing a journal entry until February 8, 2010.  The entry found:

> 1.  Defendant has without cause withheld the child from her father and her grandparents on several occasions.
>
> 2.  The Defendant demonstrates limited parenting skills, not only because she does not seem to understand the value of the child's association with grandparents and the father but also by the alienation of her other children.
>
> 3.  The grandparents have provided a safe and stable home for the child and have seen to it that the child has contact with the Defendant at all ordered times.
>
> 4.  Defendant's home in Adams County was unsuitable, and although she has moved in with yet another adult male in Brown County who has a good residence, her behavior of going from one boyfriend to another causes the court to question her stability.  Indeed, testimony about her having sent nude photos of herself to a previous male friend, among the other matters listed above, drew the court to the conclusion that she is not a suitable custodian for a young child.
>
> 5.  The grandparents have provided a home and stability for this child when no one else was able or willing to do so, and she has thrived in their care.

**{¶ 38}** Hazelbaker has appealed from this judgment entry.[3]

## II.  Assignments of Error

**{¶ 39}** Hazelbaker presents a single assignment of error:

> The trial court committed an abuse of discretion by granting custody to a nonparent when the record does not support a finding that custody to mother would be detrimental to the child, and thus that mother would be an unsuitable parent.

## III.  Custody Disputes Involving a Nonparent

---

[3] Although a party to this matter, Purvis did not file a brief.  Subsequent to the court's journal entry awarding custody of B.P. to the Heatons, Purvis filed a new motion for change of custody and now claims that Debbie Heaton "manipulates [his] daughter's time so that [his] parenting time is limited."

**{¶ 40}** In her sole assignment of error, Hazelbaker argues that the trial court abused its discretion by finding that she is an unsuitable parent because the record lacks competent and credible evidence that her retention of custody would be "detrimental" to B.P.  We agree.

A.  The Parent's Paramount Right to Custody

**{¶ 41}** The right to raise one's child is regarded as essential and fundamental. See *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169.  "[I]t has been deemed 'cardinal' that the custody, care and nurture of the child reside, first, in the parents." Id., quoting *Prince v. Massachusetts* (1944), 321 U.S. 158, 166, 64 S.Ct. 438. The United States Supreme Court, in *Troxel v. Granville* (2000), 530 U.S. 57, 65-66, 120 S.Ct. 2054, held that a parent has a fundamental right to make decisions concerning his or her children.  Courts have therefore "sought to effectuate the fundamental rights of parents by severely limiting the circumstances under which the state may deny parents the custody of their children." *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, at ¶ 17, citing *Perales*, 52 Ohio St.2d 89, 369 N.E.2d 1047, at syllabus.

**{¶ 42}** Accordingly, "in a child custody proceeding [under R.C. 2151.23(A)(2)] between a parent and nonparent, a court may not award custody to the nonparent 'without first determining that a preponderance of the evidence shows that the parent abandoned the child; contractually relinquished custody of the child; that the parent has become totally incapable of supporting or caring for the child; or that an award of custody to the parent would be detrimental to the child.' [*Perales* at syllabus.]  If a court concludes that any one of these circumstances describes the conduct of a parent, the

parent may be adjudged unsuitable, and the state may infringe upon the fundamental parental liberty interest of child custody." *In re Hockstok,* 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, at ¶ 17.

{¶ 43} A "preponderance of the evidence" is "evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it." Black's Law Dictionary (6th Ed.1998) 1182.

## B.  Standard of Review

{¶ 44} Although a trial court possesses broad discretion in custody matters, *Reynolds v. Goll* (1996), 75 Ohio St.3d 121, 124, 661 N.E.2d 1008, it does not have discretion to terminate a parent's right to custody when the finding of unsuitability is not supported by the record.  *Perales*, 52 Ohio St.2d 89, 369 N.E.2d 1047.  Thus, we will review the record under a manifest-weight-of-the-evidence standard to see whether competent, credible evidence supports the trial court's finding of unsuitability.  See *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280, 376 N.E.2d 578, cited with approval in *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, at ¶ 24; *State v. Schiebel* (1990), 55 Ohio St.3d 71, 74-75, 564 N.E.2d 54.

## C.  Findings of Detriment to B.P.

{¶ 45} Hazelbaker contends that the trial court erred in concluding that she is an unsuitable parent.  Generally, she argues (1) that certain findings of fact are irrelevant to the "unsuitability" analysis, i.e., they are actually considerations under the "best interest" analysis, and (2) that other findings simply do not support the conclusion that it would be detrimental to B.P. for her to retain custody.   We will review each finding of fact to determine whether (1) it is a relevant consideration under the *Perales* unsuitability

analysis and (2) there is some competent and credible evidence in the record to support it.

> 1. Defendant has without cause withheld the child from her father and her grandparents on several occasions.

**{¶ 46}** Hazelbaker admits that facilitating court-approved parenting time is a best-interest- analysis factor under R.C. 3109.04(F)(1), but she argues that the evidence did not demonstrate that B.P. suffered any detriment from missing court-ordered visitation time.  The Heatons argue that the evidence demonstrates that Hazelbaker used B.P. as a "bartering tool" to get the Heatons to "bend to her wishes."

**{¶ 47}** Hazelbaker did not send B.P. to stay with the Heatons one weekend in late 2006 when Hazelbaker's family visited from out of town and she wanted B.P. to meet them.  And Hazelbaker discontinued visitation with the Heatons for a period of approximately two months in late 2006 after she filed for a protection order against Purvis, naming herself and B.P. as protected parties (Purvis was residing with the Heatons during this period).  Hazelbaker explained that the reason she did not send B.P. to the Heatons was because a sheriff's office employee told her that if she had a protection order against Purvis that included B.P. as a protected party, she should not send B.P. where he was living.

**{¶ 48}** The Heatons exercised visitation regularly with B.P. from 2000 up until the incidents of withholding in late 2006.  In fact, Mrs. Heaton testified that the Heatons saw B.P. very freely until October 2006, even when Hazelbaker and Purvis were not in a relationship.  Hazelbaker voluntarily signed paperwork so the Heatons could take B.P. with them to visit Purvis while he was incarcerated.

{¶ 49} There is no evidence in the record of any visitation disputes between the Heatons or Purvis and Hazelbaker following the December 2006 agreement to recommence visitation, and Hazelbaker has never been held in contempt of court for violating a visitation agreement.  In fact, Purvis testified that Hazelbaker allowed him and the Heatons two days of visitation with B.P. over the Thanksgiving 2007 holiday even though it had been her turn to spend the holiday with B.P., and that Purvis and Hazelbaker have "trick or treated," thrown a joint birthday party for B.P., and taken B.P. Christmas shopping together.

{¶ 50} Although there is evidence in the record to support the trial court's finding that Hazelbaker withheld visitation with B.P. from the Heatons and Purvis for a period in 2006, there is no evidence that these actions have been detrimental to B.P. Significantly, none of the parties or other witnesses testified to any detrimental effect on B.P. as a result of Hazelbaker's actions or introduced any other evidence to support such a finding.[4]

{¶ 51}  We do acknowledge that a court may infer a detrimental effect on a child when a parent engages in such a pattern of withholding visitation as to demonstrate that the parent is clearly interfering in a child's relationship with her other parent or grandparents.  However, there is no competent and credible evidence that such a pattern exists here.  Even assuming that Hazelbaker's decision to withhold visitation from the Heatons while B.P. was listed on the protection order against Purvis was unjustified, this was a brief period in an otherwise continuous relationship between B.P. and her paternal family.  Even the testimony of Mrs. Heaton and Purvis establishes that

---

[4] We do not suggest that contempt sanctions for withholding visitation must be based upon a finding of detriment.  However, contempt of court is not the issue here.

Hazelbaker generally allowed them visitation with B.P., even whenit was not required by the court.

{¶ 52} We conclude that although there is some evidence to support the trial court's finding that Hazelbaker withheld visitation without cause, the court's conclusion that these actions establish that Hazelbaker's retention of custody would be detrimental to B.P. is not supported by the record.

> 2.  The Defendant demonstrates limited parenting skills, not only because she does not seem to understand the value of the child's association with grandparents and the father but also by the alienation of her other children.

{¶ 53} The first aspect of this finding -- that Hazelbaker failed to understand the value of B.P.'s association with her grandparents -- appears to be directed to the missed visitation in 2006.  Thus, we decline to reexamine that finding here and rely upon our previous analysis.

{¶ 54} Concerning the alienation of her other children, Hazelbaker argues that this sort of finding is improper in the unsuitability analysis because the focus should be on the individual child in question.  Stated otherwise, she contends that the record lacks competent and credible evidence that the alienation from her other children caused detriment to B.P.  She further argues that the testimony of her children about her "bad mothering" was only relevant to the year prior to their testimony, which was received in 2007.  And Hazelbaker contends that we should view Heather's testimony as "suspect" because Heather was angry at her.

{¶ 55} Hazelbaker's children are clearly alienated from her.  Based upon a parent's poor relationship with that parent's other children, a court might infer that it is only a matter of time until an existing good relationship with the child in question

degenerates into an unsatisfactory one. However, the standard for awarding custody to a nonparent under *Perales* is whether an award of custody to the parent *would* be detrimental to the child, not whether such an award of custody *could* be detrimental to the child in the future. In the absence of some evidence that the schism is having a detrimental effect upon B.P., the trial court could not conclude that Hazelbaker is presently an unsuitable parent to B.P.

{¶ 56} There is certainly other testimony from Elisha, Heather, and Nathan to establish instances of limited parenting skills that may affect B.P., i.e., purchasing alcohol instead of food, excessive sleeping instead of caring for her children, going out frequently, and permitting or participating in drug usage in the home. However, the court made no findings of fact based upon any of this testimony; therefore, we can only conclude that the trial court either did not find much of the testimony credible[5] or did not believe this conduct was having a detrimental effect on B.P.

{¶ 57} We conclude that merely being alienated from other children does not mean it would be detrimental to award custody of a different child to the parent. Therefore, we search for evidence suggesting that Hazelbaker's alienation from her other children is causing detriment to B.P.

{¶ 58} Dr. Smiley stated in his second custody evaluation that he had "concerns" about B.P.'s lack of contact with Elisha, Heather, and Nathan. Apparently, due to the

---

[5] There were conflicts in the testimony of the three older children. For example, Elisha testified that she frequently babysat her younger siblings so that Hazelbaker could go out, but Nathan testified that Elisha "infrequently" babysat him during their visits. Heather testified that she observed drug use by Hazelbaker and her then boyfriend, but Elisha testified that she never observed any drug use in the home. There were also instances of conflict between Hazelbaker's children and other evidence in the record. For example, Heather testified that there was no heat or air conditioning in Hazelbaker's home, but the guardian ad litem report found the home to be adequate. Additionally, although Hazelbaker was apparently reported to and investigated by Adams County Children Services on multiple occasions, the agency never concluded that the home was inadequate or lacking basic necessities such as food.

other children's general dislike of their mother, they would see B.P. only when she

visited with the Heatons.  Thus, the record contains some support for the trial court's

finding that lack of contact with her half-siblings would cause some level of harm to B.P.

However, because B.P. maintains a relationship with her half-siblings through the

Heatons, it is unreasonable to conclude that B.P.'s limited relationship with her now

grown half-siblings would constitute such a detriment under *Perales* as to demonstrate

that Ms. Hazelbaker is an unsuitable parent.

> 3.  The grandparents have provided a safe and stable home for the child
> and have seen to it that the child has contact with the Defendant at all
> ordered times.

**{¶ 59}** Hazelbaker argues that the first aspect of this finding of fact, i.e., the

Heatons' safe and stable home, is a proper consideration under the R.C. 3109.04(F)(1)

best-interest analysis but has no import in determining whether retaining custody of B.P.

would be detrimental to her under *Perales*.  Hazelbaker is correct.  "The *Perales*

'suitability' test is distinguishable from the 'best interest' test.  Under the best interest

test, the court looks for the best situation available to the child and places the child in

that situation.  [*In re*] *Lowe* [(Jan. 16, 2002), Columbiana App. No. 00CO62, 2002 WL

75937]. The suitability test, on the other hand, requires a detriment to the child be

shown before the court takes him/her away from an otherwise suitable parent."  *In re*

*Davis*, Mahoning App. No. 02-CA-95, 2003-Ohio-809, at ¶ 12.  "Under the suitability

test, '[s]imply because one situation or environment is the "better" situation does not

mean the other is detrimental or harmful to the child. '" Id., quoting *Lowe* at *2.

**{¶ 60}** Accordingly, though there was competent and credible evidence in the

record to support a finding that the Heatons' home was safe and suitable, this factor is

irrelevant to the unsuitability analysis. Moreover, even if we were to assume that the implication here is that Hazelbaker's home was not safe and suitable, the record squarely contradicts such a finding. Although there were allegations that there was drug use in Hazelbaker's home in Adams County and that strange men were sometimes there, this testimony was apparently not credited by the trial court, as it made no finding in this regard. Moreover, the guardian ad litem expressly found that Hazelbaker's home was suitable for B.P. And notably, there was no evidence presented that there were any issues with Hazelbaker's current home, i.e., Shipley's residence. Shipley explained that B.P. had a room to herself while she stayed there on her visits, and the residence passed a home inspection ordered by the trial court. Accordingly, this aspect of the trial court's decision fails to support an unsuitability determination, and the trial court erred as a matter of law to the extent it relied upon it.

{¶ 61} The trial court's finding that the Heatons ensured that B.P. had contact with Ms. Hazelbaker at all ordered times is similarly irrelevant to the unsuitability analysis. Assuming that the record contains competent and credible evidence of this finding, it is simply not pertinent to whether Hazelbaker's retaining custody would be detrimental to B.P. The focus of the unsuitability determination must necessarily be on the parent's acts or omissions. The Heatons' admirable adherence to honoring court-ordered custody arrangements has no logical nexus to a finding that awarding custody to Hazelbaker would be detrimental to B.P.

> 4. The Defendant's home in Adams County was unsuitable, and although she has moved in with yet another adult male in Brown County who has a good residence, her behavior of going from one boyfriend to another causes the court to question her stability. Indeed, testimony about her having sent nude photos of herself to a previous male friend, among the

other matters listed above, drew the court to the conclusion that she is not a suitable custodian for a young child.

{¶ 62} Hazelbaker challenges the court's assertion that her home in Adams County was unsuitable.  She points to the guardian ad litem's supplemental report, which stated that both her home and the grandparents' home were suitable.  We agree that the guardian ad litem found the Adams County home to be suitable.

{¶ 63} In concluding that Hazelbaker was not a suitable custodian for B.P., the trial court's findings indicate two reasons it was concerned about her stability: (1) her behavior of going from one boyfriend to another and (2) her decision to send nude photographs of herself to a previous boyfriend.  However, there is no evidence in the record that Hazelbaker's sexual activities had a negative impact on B.P.

{¶ 64} We reject the notion that having several boyfriends over a multiyear span establishes the sort of parental deficiency that could support a finding of parental unsuitability.  The evidence demonstrated that one of Hazelbaker's ex-boyfriends, Kevin Hesler, may have engaged in a domestic dispute or even been violent with her.  However, Hazelbaker lived with Hesler for only a four- month period in 2006.  Moreover, when this dispute occurred, B.P. was in the Heatons' care.  Regardless, there is no evidence in the record that Hazelbaker's romantic relationships had any detrimental effect on B.P.

{¶ 65} The nude photographs clearly demonstrate that Hazelbaker exercised poor judgment in 2005.  But again, there was no competent and credible evidence presented either at the preremand hearing or the postremand hearing demonstrating that these nude photographs caused any detriment to B.P.  While it was undoubtedly unwise for Hazelbaker to store nude photographs of herself on a computer that her

young daughter could potentially access, there was no competent and credible evidence in the record demonstrating that B.P. suffered any *actual, direct harm* from the existence of these photographs. Accordingly, the trial court abused its discretion to the extent that it relied upon the mother's behavior of having several boyfriends over a five-year period and possessing nude photographs on her computer to justify its decision that Hazelbaker was an unsuitable parent.

> 5. The grandparents have provided a home and stability for this child when no one else was able or willing to do so, and she has thrived in their care.

**{¶ 66}** Hazelbaker contends that this finding of fact does not support the trial court's decision that she is an "unsuitable" mother because the evidence also showed that she had provided a home and stability for the child and that the child has thrived in her care. She further argues that the guardian ad litem's report found that both her home and that of the Heatons were appropriate and suitable for the child. Additionally, Hazelbaker points to Dr. Smiley's report, which indicated that B.P. felt safe and secure while living with Hazelbaker. Ultimately, Hazelbaker contends that the trial court simply determined that the Heatons' home provided a better home environment for B.P., a consideration not appropriate in determining whether she was suitable to raise her own child.

**{¶ 67}** Concerning the first aspect of this finding of fact—the Heatons' home – we again defer to our analysis concerning finding-of-fact three. Accordingly, we reject this finding as supportive of the trial court's unsuitability determination.

**{¶ 68}** Finally, the court's finding that "no one was able or willing" to provide a home or stability for B.P. is simply unsupported by the record. There is no evidence

that Hazelbaker was unable or unwilling to provide a home for B.P.  In fact, Hazelbaker has consistently fought to maintain custody of B.P. while providing the Heatons with visitation opportunities.  Neither her home in Adams County nor her current residence in Brown County has been deemed unsuitable for B.P. to reside in.

### D. Totality of Findings

{¶ 69} We recognize that the trial court's discretion in custody matters should be accorded the utmost respect; however, we find that the court's ultimate conclusion that retention of custody by Hazelbaker would be detrimental to B.P. is simply not supported by competent and credible evidence.  Although the trial court made factual findings in support of its decision, some of these findings were simply irrelevant because they pertained only to a "best interest" analysis that was inapplicable here.  Other findings do not sustain the unsuitability determination because there is no evidence that B.P. has suffered or would suffer any detriment by a continuation of custody with Hazelbaker.  In fact, the testimony from all witnesses established that B.P. is a happy, healthy child who performs well in school and loves all the adults in her life.

{¶ 70} Furthermore, although there is certainly evidence demonstrating that Hazelbaker is not a flawless parent, this is not the standard for an unsuitability finding under *Perales*.  A review of other cases involving unsuitability findings reveals far more substantial evidence to support a finding that parental custody is detrimental to a child.  See, e.g., *In re Z.A.P.,* 177 Ohio App.3d 217, 2008-Ohio-3701, 894 N.E.2d 342 (while child lived with mother, he had serious behavior problems and took several medications for behavior; child claimed physical abuse by mother's live-in boyfriend; mother's house was dirty and in disarray; several unrelated individuals lived in the house including a

known "druggie"; child had no structure at mother's home; child would be "emotionally devastated" if forced to return to home; and child's behavior had significantly improved and he had been removed from medications while he lived outside of mother's home); *In re A.W.-G.*, Butler App. No. CA2003-04-099, 2004-Ohio-2298 (mother unable to maintain employment and housing, child experiences rash due to lack of hygiene while in mother's care, mother does not consistently provide care for child's medical issues); *Karr v. Dunn*, Pickaway App. No. 03CA22, 2004-Ohio-928 (mother returned to work when child was three weeks old without arranging childcare, failed to provide financial support for child, abandoned child for several weeks, lived in six homes over four-year period, failed to provide consistent medical care for child ; also home lacked electricity and running water and was unsanitary).

## IV. Conclusion

{¶ 71} We conclude that the trial court's finding that Hazelbaker is an unsuitable parent because her retention of custody of B.P. would be detrimental to B.P. is not supported by the record.  The trial court's ultimate conclusion is based on findings that are irrelevant to the analysis or unsupported by competent and credible evidence of detriment.  Therefore, the trial court's decision to award custody to the Heatons was unreasonable.

Judgment reversed
and cause remanded.

MCFARLAND, P.J., and KLINE, J., concur.

HARSHA, J., dissents.