[Cite as *In re T.G.*, 2022-Ohio-1521.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

|  |  |  |
|---|---|---|
| IN RE: T.G. | : | |
| | : | |
| | : | Appellate Case Nos. 29327 & 29328 |
| | : | |
| | : | Trial Court Case No. G-2020-002600-0E, 0G |
| | : | |
| | : | (Appeal from Common Pleas |
| | : | Court – Juvenile Division) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 6th day of May, 2022.

. . . . . . . . . . .

BEN M. SWIFT, Atty. Reg. No. 0065745, P.O. Box 49637, Dayton, Ohio 45449
        Attorney for Appellant-Mother

CYNTHIA L. WESTWOOD, Atty. Reg. No. 0079435, 7700 Paragon Road, Suite A, Dayton, Ohio 45459
        Attorney for Appellants J.C. & V.C.

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Mother appeals from a judgment of the Montgomery County Common Pleas Court, Juvenile Division, which granted legal custody of her minor daughter, T.G., to Father's second cousin, V.C., and her husband J.C. ("the Caregivers"). (Montgomery App. No. 29327.) The Caregivers also appeal, challenging the juvenile court's award of parenting time to Mother. (Montgomery App. No. 29328.) We have consolidated these appeals. Father did not request custody and is not involved in this appeal. We conclude that the trial court's determination that Mother was unsuitable is not supported by the record and is against the preponderance of the evidence. Accordingly, the judgment of the trial court granting legal custody to the Caregivers is reversed, and the matter is remanded for further proceedings consistent with this opinion. The Caregivers' appeal regarding the trial court's determination of Mother's visitation time is premature in light of our resolution of Mother's appeal.

## I.     Facts and Course of Proceedings

{¶ 2} On July 15, 2020, T.G. was born prematurely at just over 36 weeks at Miami Valley Hospital. At that time, Mother had a presumptive positive test result for amphetamines based on her urine screen. This test prompted a referral to Karen Martin, a medical social worker at the hospital. Martin then contacted Montgomery County Children Services ("MCCS").

{¶ 3} Chelsea Sonnycald, a social worker for MCCS, received the referral from Miami Valley Hospital. When informed that T.G. could not go home with her, Mother

identified her mother name and an aunt, Christa Powers, as a possible placements for T.G. Mother did not want T.G. to go to the Caregivers, who already had legal custody of R.G.2, a biological child of Mother and Father who was born drug-exposed to methamphetamines in 2015. Mother and Father had agreed to relinquish legal custody of R.G.2 to the Caregivers in March 2017. Once the Caregivers' legal custody of R.G.2 was established, MCCS was no longer involved with R.G.2's case. However, because the Caregivers had legal custody of R.G.2, Sonnycald contacted them to determine if they could be a potential placement option for T.G. Although the Caregivers indicated they would be available as a placement, Sonnycald prepared a Safety Plan with Powers instead so that T.G. could be released to Powers' care from the hospital. Powers' home was approved as a placement and, on July 18, 2020, T.G. was released from the hospital to the care and custody of Powers.

{¶ 4} When the Caregivers contacted Sonnycald for an update, she informed them that they were not a party and she could not update them. On July 23, 2020, the Caregivers filed an ex parte motion for interim temporary custody. At that time, the Caregivers were aware that T.G. had been placed with Powers by MCCS, but they were concerned that they did not know Powers, so they were unsure if she was a good placement. The motion for interim custody was granted, and police took T.G. from Powers and gave her to the Caregivers. That same day, the Caregivers also filed for legal custody.

{¶ 5} A hearing was not held on the ex parte order until July 28, 2020, to determine interim temporary custody. The trial court granted the Caregivers interim temporary custody and granted Mother supervised visitation of at least five hours per day, three

times per week. A trial was scheduled for October 19, 2020. The following day, Powers filed a motion requesting custody of T.G.

{¶ 6} On August 12, 2020, the Caregivers filed a motion requesting the court order Mother to submit to a hair follicle test. That motion was granted on August 27, 2020. The results were negative for all drugs tested, including methamphetamine. The Caregivers did not request that Father complete a drug screen, because he was not seeking custody of T.G.

{¶ 7} On the day of trial, at Mother's request, the trial was continued until February 9, 2021. On February 4, 2021, the guardian ad litem ("GAL") filed a report with the court recommending that legal custody of T.G. be given to the Caregivers and that Mother's visitation be reduced to three hours per week to accommodate the Caregivers' schedule. The GAL's concerns were that Mother did not make enough money to support T.G. and that Mother had a history of past drug use in addition to her denial of drug use immediately prior to T.G.'s birth.

{¶ 8} A custody hearing was held on February 9, 2021, wherein the parties all testified, along with Karen Martin from Miami Valley Hospital, the two MCCS workers involved in T.G.'s case, and two employees from Clearing Path, where Mother obtained mental health and drug treatment services. The following additional evidence was presented at trial.

{¶ 9} After Mother's urine test results came back presumptive positive at Miami Valley Hospital, Martin met with Mother to discuss the situation. Mother informed Martin that she lived with her five-year-old son, R.G.2, and Father. When informed that MCCS

would have to get involved, Mother was tearful and admitted she had been involved with MCCS previously. She further admitted that she had lost custody of R.G.2 and he did not live with her.

**{¶ 10}** When asked about the last time she had used amphetamines, Mother claimed it had been in January 2020, when Mother found out she was pregnant. Martin, however, believed that Mother had used drugs directly prior to T.G.'s birth based on the presumptive positive test result at the hospital. Although the medical records indicated a presumptive positive result and Martin had seen that presumptive positive result, she had not seen a confirmatory test result. It was the practice of the hospital to treat a presumptive positive result as an actual positive result. No other drug testing was conducted while Mother was in the hospital, and there was no drug testing of T.G. at any time.

**{¶ 11}** According to Martin, while Mother was in the hospital, she was concerned about T.G. and wanted to take T.G. home with her. The hospital records reveal that Mother engaged with T.G. at the hospital by holding her, feeding her, and changing her diapers during the duration of their stay. There was a notation in the medical records that T.G. should be bottle fed instead of breastfed due to Mother's admitted use of amphetamines in January 2020.

**{¶ 12}** To explain the presumptive positive result, Mother told Father that he must have slipped it to her, which he denied. Mother also claimed she had eaten an Alka Seltzer gummy the night before, which may have prompted the positive drug screen. Father had never known anyone to test positive for taking Alka Seltzer gummies.

Sonnycald also testified that no one had ever stated that possibility to her before. The referral from the hospital to MCCS stated that Mother admitted that she used "speed" before coming to the hospital. The medical records indicate that Mother admitted to the use of "speed" in January 2020.

{¶ 13} Sonnycald met with Mother at the hospital on July 17, 2020, to discuss the situation. Mother stated that she had not used drugs since January 2020 but had taken drugs at least once a month prior to January 2020. Mother also told Sonnycald that Father had stopped using drugs in January 2020. Sonnycald informed Mother that she needed to get a drug and alcohol analysis and mental health assessment and to refrain from drug use before she could have T.G. placed back with her.

{¶ 14} A case plan was created through MCCS for Mother, but it was not court-ordered. It required Mother to maintain stable housing, maintain employment, undergo a mental health and drug and alcohol assessment, attend visitation with her daughter, sign releases of information, and attend medical appointments for T.G. In July 2020, Sonnycald identified the following concerns: Mother did not have protective capabilities suitable to care for T.G.; Mother was still with the man who had been abusive toward her for years (i.e. Father); she was still abusing drugs; and she did not have stable housing. Sonnycald also was concerned that even though Mother got herself into treatment, Mother denied she had a drug problem anymore. Sonnycald also believed that Mother was not being truthful with the hospital about the presumptive positive drug screen and that Mother was living with maternal grandmother at the time rather than in her own residence.

{¶ 15} During the course of her time working on the case, Sonnycald had never seen Mother and Father together. Her concern that they were still together was based on statements Father allegedly had made to the Caregivers, who then passed on that information to Sonnycald. While Sonnycald indicated that Mother minimized her concerns about the investigation, she also noted that Mother recognized she needed to make serious changes to get her child back and understood that she would need support to do it. During a visitation, Sonnycald observed Mother to be appropriate with T.G. and had no concerns regarding Mother's treatment of the child.

{¶ 16} Father testified but was otherwise uninvolved in the hearing or the case. Mother and Father had never married but had been in a relationship for about seven years. They had lived together in Riverside, Ohio, from at least the time they lost custody of R.G.2 until Mother moved out of the home when she was six or seven months pregnant to live with maternal grandmother in 2020. Both Mother and Father had used methamphetamines on a daily basis prior to January 2020. Father had not seen Mother using drugs since she found out she was pregnant in January 2020, and he did not believe Mother had been using drugs at the time T.G. was born.

{¶ 17} Father never engaged in a case plan or had any contact with MCCS after T.G. was born. He was not involved in any drug treatment and admitted he was still using marijuana and methamphetamines on a daily basis at the time of the custody trial. Father also had felony convictions for felonious assault and shooting into a habitation along with several prior charges of operating a vehicle while under the influence ("OVI") prior to 2012. Although not convicted, Father had been charged with domestic violence against a prior

girlfriend, and there had been allegations of domestic violence against Mother. At the time of the hearing, Father was not employed.

{¶ 18} After leaving the hospital, Mother never moved back in with Father. However, according to Father, Mother still had regular contact with him as they continued to see each other or have communications a couple of times per week. A week before trial, Father informed the GAL that he thought T.G. would be better off with the Caregivers, and Mother no longer wished to talk to Father as a result. Father also claimed that Mother would deny going to his house, because the social worker had informed her that she would not be able to get T.G. back if she continued to stay with Father. Mother informed the caseworker that she was not in a relationship with Father after T.G. was born, but she admitted they still had communication because they shared two children together.

{¶ 19} Father did not file for custody of T.G. and did not believe that he should have custody of her by himself. He also did not believe that Mother should have custody of T.G. by herself. He was concerned that Mother could not care for herself because she had to have her teeth pulled for not taking care of them, so he questioned how Mother could care for their daughter. Father acknowledged that Mother loved her children more than anything in the world but believed T.G. should stay with the Caregivers. Father had no concerns with the Caregivers' ability to provide for T.G. or keep her safe.

{¶ 20} The Caregivers had been married for nearly 16 years and had one child together who was 14 years old. V.C. had three children from a prior marriage. The Caregivers also had had legal custody of R.G.2 since 2017. One of V.C.'s adult sons from a prior marriage had drug problems and had died of a drug overdose in 2015.

{¶ 21} Prior to obtaining custody of R.G.2, the Caregivers had not been familiar with Mother and had only met her one time. Their only knowledge of Mother came from the supervised visitation that Mother had with her children. They admitted that both Mother and Father paid child support each month. Because MCCS had not been involved with the Caregivers in this private custody matter, there had been no home study completed in 2020. MCCS had completed a home study when R.G.2 was originally placed with the Caregivers.

{¶ 22} J.C. had worked as a software engineer for LexisNexis for 22 years. He frequently supervised the visitations with Mother and Father. In order to accommodate the visitations, he used family medical leave, but he indicated that it would run out. According to J.C., the visits were a burden on him but not a hardship. The Caregivers recommended that Mother's visitation be reduced to 12 hours per month to align with R.G.2's visitation schedule.

{¶ 23} Mother consistently attended visitation with both her children; 15 hours per week for T.G. and 3 hours per week for R.G.2. Between T.G.'s birth and the hearing, Mother had more than 75 visits with T.G. and only missed one due to Mother's health. According to J.C., Mother's visits were okay, but not good, because Mother called the Caregivers "baby stealers" during a visit. Additionally, Mother had wanted to breastfeed T.G., but the Caregivers refused to allow this because of the presumptive positive drug test at the hospital. V.C. conceded that Mother had shown tremendous interest in visiting and connecting with her daughter.

{¶ 24} J.C. did not have a criminal history. V.C., however, had been charged with

an OVI and child endangering in 1997, but the child endangering charge was dropped. She was also charged with OVI in 2000 and again in 2004. As a result of the 2004 incident, V.C. went through a 28-day alcohol treatment program and went to Alcoholics Anonymous (AA) meetings. V.C. testified that her church and family were her treatment. According to the Caregivers, V.C. no longer drank alcohol and had been sober since January 2004.

{¶ 25} The Caregivers were unaware that Mother or Father used drugs but knew there had been a history of use due to R.G.2's case. J.C. never saw anything that caused an apparent, immediate danger during visitations. Although they were informed that Mother was testing negative for drugs, J.C. still had a concern that Mother was using drugs, because he did not believe her. J.C. also did not believe that T.G. would be safe with Mother but did not elaborate as to why. V.C. believed Mother had been sober for about seven months at the time of the hearing. Despite this, V.C. did not believe it would be safe for T.G. to go home with Mother, because she did not believe that seven months of sobriety was long enough. Both Caregivers stated that their perception of Mother would change if she were to admit that she took drugs in July 2020.

{¶ 26} Carolyn Granger took over the case as the caseworker for MCCS on October 8, 2020. Mother was compliant and met with Granger monthly at Mother's home. Granger also observed visitation once per month. Granger testified that Mother and T.G. had appropriate interactions during visitations. Mother was holding, cuddling, and burping T.G. Mother could explain how much T.G. was feeding and how many wet diapers T.G. had.

{¶ 27} According to Granger, Mother's home was appropriate for T.G. and had all the necessary baby items such as a crib, bouncer, diapers, and clothing. The housing was suitable with operating utilities and available food, was clean, and had no safety hazards. Granger was informed by Mother that Mother and Father had limited contact. However, in February, when Granger asked Mother for clarification about her contacts with Father, Mother admitted she had contact with Father on a weekly basis. Granger never saw any male clothing in Mother's home to indicate that anyone was living there besides Mother. Because Father was not involved with MCCS and Granger never had contact with him, she was unaware that Father was still using drugs.

{¶ 28} Granger verified that Mother was working at Family Dollar by reviewing her check stubs regularly since October 2020. According to Granger, Mother had successfully completed all the case plan requirements. She testified that, had MCCS been a party to the case, MCCS would have recommended that custody be returned to Mother.

{¶ 29} Granger explained that Mother was concerned when T.G. had health issues, such as catching a cold or a runny nose. Mother informed Granger that she would have to contact Father to contact the Caregivers because they would not listen to Mother. The Caregivers denied this. In October 2020, T.G. had a rash on her neck of which Mother took a picture during a visitation; she forwarded that picture to Granger. Mother was concerned the Caregivers had not taken care of it. When Granger checked with the Caregivers, they indicated they had taken T.G. to the doctor and received medication for the rash. There was also a time when T.G. had baby acne that Mother brought to the Caregivers' attention, but they did not believe it was necessary to take T.G. to the doctor.

T.G. also had a rash on her stomach that the Caregivers said they addressed. In December, T.G. had a cold and was taken to the doctor. Additionally, T.G. had some congestion at the end of December, and J.C. took her back to the doctor, where T.G. was diagnosed with an ear infection. Mother also claimed that the Caregivers were giving T.G. Tylenol to get her to sleep. The Caregivers explained that the Tylenol was only used after T.G. got shots. According to J.C., Mother attended every medical appointment for T.G. except for when he took T.G. in for emergency medical treatment.

{¶ 30} Mother also raised concerns about the Caregivers' ability to care for T.G. due to the fact that V.C. babysat too many other children in her home and might not be able to sufficiently attend to T.G. Mother was also concerned that T.G. might get COVID-19 from being around so many other people. V.C. testified that she ran an unlicensed daycare in her home watching up to five non-relative children at a time, plus R.G.2 and T.G. Her eldest son, who was 14 years old at the time of the hearing, was also in the home after school. V.C. testified that she was legally allowed to have six children in her care, not counting her eldest son, and believed that she did not exceed the limit and did not require a license.[1]

{¶ 31} Kimberly McKinley was a case coordinator at Clearing Path. She had been a registered nurse for 25 years and had previously worked at TCN Behavioral Health at Christopher's House, a residential substance abuse facility. McKinley testified that Mother began working with Clearing Path on July 21, 2020, and had consistently attended

---

[1]The statutory limit for unlicensed child care in the permanent residence of the provider in which child care is provided is a maximum of six children and no more than three children under two years of age. Ohio Adm.Code 5101:2-13-01(JJ). "Child" includes any persons in the home under the age of 15. Ohio Adm.Code 5101:2-13-01(F) and (CC).

intensive outpatient groups three times per week for three hours each visit and had never missed a session. Mother informed McKinley that MCCS had been involved in the case due to past drug usage, but McKinley did not recall that Mother discussed having tested drug-positive in July 2020. Mother successfully completed the intensive outpatient program on November 4, 2020, and progressed to the standard outpatient program. Mother consistently saw her therapist and had had several negative drug screens since beginning treatment at Clearing Path. According to McKinley, Mother had been sober with clean urinalyses done on a random basis, which were taken whenever they asked, but at least every two weeks. Mother also came in for drug screens more frequently than they had asked her to do. On one occasion, a preliminary test came back positive for Buprenophine, but when the sample was sent to the lab for confirmatory testing, the result was negative for all drugs.

{¶ 32} At the time of the hearing, McKinley testified that Mother was attending two-hour outpatient groups twice per week and seeing her therapist twice per month. Mother was also attending AA/NA (Narcotics Anonymous) meetings outside of Clearing Path and had obtained a sponsor for the 12-Step Program. McKinley had no concerns or issues with Mother who, according to McKinley, was "100 percent" compliant. She believed that Mother had shown a high level of commitment to recovery.

{¶ 33} Mildred Bailey was a licensed drug counselor for Clearing Path. As one of Mother's counselors, she testified that Mother actively participated in group treatment and individual therapy. Mother attended all groups and was compliant. According to Bailey, Mother was doing "extremely well." Mother admitted to Bailey that she had a substance

abuse problem and was trying to improve her life. In Bailey's professional opinion, Mother was changing her life and had made a transformation for the better.

{¶ 34} According to Sonnycald, MCCS would not notify an individual of a drug screen in advance in order to make it random. However, Sonnycald claimed that Clearing Path would notify Mother a day before the screen that she would be drug tested. This was refuted by Clearing Path workers. Sonnycald did testify that she randomly tested Mother one time and the result came back negative.

{¶ 35} Powers testified she filed for custody because Mother was upset with the current custody arrangement and stated she was going to separate from Father. Powers wanted custody only if Mother did not get custody. Powers was unaware of Mother's ever using drugs but was aware of the presumptive positive test from the hospital.

{¶ 36} Powers lived in Farmersville, Ohio with her husband for over 30 years. She lived in a three-bedroom home with her husband, daughter, and granddaughter. The granddaughter and daughter shared a room so that if she got custody, T.G. would have her own bedroom. Powers believed that Mother should have custody of T.G. She did not believe that Mother was still in a relationship with Father.

{¶ 37} At the time of the custody trial, Mother was 31-years-old. She testified that she had lived alone in a three-bedroom home in Dayton since October 2020. She rented the home from her cousin and produced a copy of the rental agreement. An addendum to the agreement indicated that Mother would not have to pay the $400 per month rent for one year if she were able to obtain custody of T.G. Mother had everything set up for

T.G. in the home including a crib, diapers, bottles, and wipes.[2] Mother testified that she was bonded with T.G. and wanted custody of her. She had family support available to her, including her aunt and cousin, who would be available to help if she needed it. She also had a childcare location selected if T.G. was returned to her custody.

{¶ 38} Mother testified she last used drugs in January 2020 when she found out she was pregnant, and she denied using drugs around the time of T.G.'s birth. Mother indicated that she had not used drugs at all while being in Clearing Path and never tested positive for drugs while there. Mother testified that if custody were given back to her, she intended to remain involved with Clearing Path, because she was serious about her recovery and remaining clean and sober. She did not believe that she had a drug problem any longer, because she was no longer taking drugs. Mother had no criminal record.

{¶ 39} Mother had worked at Family Dollar since April 2020. Prior to that, she received temporary unemployment, because a tornado damaged the business where she had worked for four years and it closed. Mother's pay stub indicated she worked 64.85 hours in a two-week time frame making $9.90 per hour. The GAL report also indicated that Mother received $195 a month in food stamps.

{¶ 40} Mother admitted that she did not complete all the case plan objectives in R.G.2's case, but she did complete them in T.G.'s case. In R.G.2's case, Mother had had both negative and positive drug screens, but in T.G.'s case, she had had all negative screens after leaving the hospital. Mother believed that the seven months of drug

---

[2] During Mother's testimony, Defense Exhibits J and K were identified documenting conditions in Mother's home and later admitted at trial. We note that although these exhibits are missing from the record on appeal, they were not material or necessary to the determination of this matter.

treatment since T.G.'s birth was enough to show sobriety and that she would maintain sobriety. Mother explained that she was not the same person as she had been before when she had given up in R.G.2's case. At that time, she had been using methamphetamine from time to time but started using daily after legal custody of R.G.2 was given to the Caregivers. Although she had agreed to legal custody of R.G.2 to the Caregivers in 2017, she wanted custody of T.G. and did not want the Caregivers to have custody of T.G. Mother admitted that she had contact with Father but stated she did not plan to get back together with him.

{¶ 41} Mother testified that in addition to the mental health and drug treatment she received at Clearing Path, she also saw a doctor who prescribed her medication for anxiety and major depressive disorder. She was taking Zoloft, Buspar, and two other medications, but she could not recall the names of the other two. Mother successfully completed parenting classes on December 15, 2020, through Catholic Social Services and submitted a copy of the certificate to the court.

{¶ 42} After the February 9, 2021 hearing, the magistrate granted legal custody of T.G. to the Caregivers and denied Powers' motion for custody. As for visitation, Mother was granted supervised visits with T.G. for four hours every week and a video call on Wednesdays for 30 minutes.

{¶ 43} Mother objected to the magistrate's decision. While a decision was pending on the objections, the Caregivers filed a motion for an interim order modifying parenting time. The Caregivers alleged that to continue providing 15 hours of supervised parenting to Mother on a weekly basis was "impractical and onerous and [was] imposing a financial

hardship." A hearing was set on the motion for May 12, 2021. Prior to the hearing, the GAL provided an updated report to the court. After a hearing was held, the trial court modified Mother's parenting time to visitation twice per week for three hours each visit. The visitation was still required to be supervised.

{¶ 44} On July 14, 2021, Mother filed supplemental objections to the magistrate's decision. A reply was filed by the Caregivers on August 4, 2021. On November 10, 2021, the trial court overruled Mother's objections and granted legal custody of T.G. to the Caregivers. In doing so, the trial court found "by a preponderance of the evidence that Mother is unsuitable to care for the child due to her long-term drug use and questionable sobriety at the time of the child's birth, both of which harmfully affect the child." The trial court made no mention of Father's suitability. The court also found that it was in the best interest of T.G. to grant legal custody to the Caregivers. However, the trial court further found that "Mother has made considerable progress in her treatment and has demonstrated a willingness to remain drug free in more recent months," such that Mother's visitation was increased to coincide with the Juvenile Court's Phase-in Parenting Time schedule beginning at paragraph two, and it ordered that the visitations be unsupervised. The trial court denied Powers' motion for custody.

{¶ 45} Mother timely appealed from the trial court's decision. The Caregivers also timely appealed. This Court consolidated the cases for appeal.

{¶ 46} Mother raises the following assignment of error:

THE TRIAL COURT ERRED IN GRANTING LEGAL CUSTODY OF APPELLANT['S] DAUGHTER TO THE [CAREGIVERS].

{¶ 47} The Caregivers raise the following assignment of error:

THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION IN GRANTING [MOTHER] THE PHASE-IN MONTGOMERY COUNTY STANDARD ORDER OF PARENTING TIME.

{¶ 48} Considering Mother's contentions raised in her brief, we construe Mother's argument to be that the trial court's decision finding her unsuitable was unsupported by the record. The Caregivers, on the other hand, do not challenge the trial court's finding of legal custody, but rather challenge only the parenting time order. The Caregivers contend that the trial court applied the correct law but failed to give appropriate weight to certain best interest factors when it determined that Mother should have increased unsupervised visitation, which constituted an abuse of discretion. We will first address Mother's assignment of error, which is dispositive of the appeals.

## II. Standard of Review and Applicable Law

{¶ 49} The juvenile court has exclusive jurisdiction to determine the custody of any child not a ward of another court of this state. R.C. 2151.23(A)(2). "It is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), citing *In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990). Thus, "the overriding principle in custody cases between a parent and nonparent is that natural parents have a fundamental liberty interest in the care, custody, and management of their children." *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 16, citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). "This interest is protected by the Due Process Clause of the

Fourteenth Amendment to the United States Constitution and by Section 16, Article I of the Ohio Constitution." (Citations omitted.) *Id.*

**{¶ 50}** "[I]n a child custody proceeding between a parent and a nonparent, a court may not award custody to the non-parent 'without first determining that a preponderance of the evidence shows that the parent abandoned the child; that the parent contractually relinquished custody of the child; that the parent has become totally incapable of supporting or caring for the child; or that an award of custody to the parent would be detrimental to the child.' " *In re R.D.B.*, 2d Dist. Montgomery No. 28122, 2019-Ohio-1547, ¶ 20, quoting *In re Perales,* 52 Ohio St.2d 89, 369 N.E.2d 1047 (1977), syllabus. "A 'preponderance of the evidence' is 'evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it.' " *Cantrell v. Trinkle*, 197 Ohio App.3d 82, 2011-Ohio-5288, 966 N.E.2d 288, ¶ 36 (2d Dist.), quoting *Black's Law Dictionary* 1182 (6th Ed.1998).

**{¶ 51}** In considering the parent's suitability, the trial court should focus "on the detriment, or harm, to the child, as opposed to a value judgment about [the parent's] morality, character, or lifestyle." *In re R.R.S.*, 2d Dist. Greene Nos. 2016-CA-25 and 2017-CA-45, 2018-Ohio-990, ¶ 8. Detriment to the child means that some type of harm is or can be suffered by the child, and the trial court should consider "the extent and magnitude of harm that is likely to be experienced by a child being placed with his or her natural parent." (Citations omitted.) *In re M.N.*, 6th Dist. Lucas No. L-15-1317, 2016-Ohio-7808, ¶ 13. " 'The appropriate analysis is whether the natural [parent] is unsuitable as custodian, not whether someone else is more suitable.' " *In re R.D.B.* at ¶ 20, quoting *In re D.C.J.,*

2012-Ohio-4154, 976 N.E.2d 931, ¶ 58 (8th Dist.).

{¶ 52} "Nonparents seeking custody have the burden of demonstrating a parent's unsuitability." *In re J.R.*, 2d Dist. Montgomery No. 26894, 2016-Ohio-5054, ¶ 8, quoting *In re D.C.J.*, 2012-Ohio-4154, 976 N.E.2d 931, ¶ 58 (8th Dist.). "The choice of taking custody away from a [biological] parent in favor of a nonparent * * * has a very high bar. The issue of unsuitability of the [biological] parent is an extreme burden." *Thompson v. Downing*, 5th Dist. Tuscarawas No. 2011 AP 10 0038, 2013-Ohio-1051, ¶ 19. "Biological parents have a fundamental liberty interest in the care, custody, and management of their children and a finding of parental unsuitability is not to be made lightly." *In re Z.P.*, 2017-Ohio-7397, 96 N.E.3d 1115, ¶ 31 (8th Dist.). If the parent is suitable, then custody must be given to the parent. *Tabler v. Myers*, 173 Ohio App.3d 657, 2007-Ohio-6219, 880 N.E.2d 103, ¶ 23 (7th Dist.).

{¶ 53} This court reviews a trial court's award of legal custody under an abuse of discretion standard. *In re D.S.,* 2d Dist. Clark No. 2013-CA-51, 2014-Ohio-2444, ¶ 11. The phrase "abuse of discretion" implies a decision by the trial court that is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Where the weight of the evidence is challenged on appeal, this court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and crested such a manifest miscarriage of justice that the judgment must be reversed * * *." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. We are guided by the presumption in favor of the finder of fact since the trial

court is best able to view the witnesses and observe their demeanor, gestures, and voice reflections and use these observations in weighing the credibility of the testimony. *In re Jane Doe*, 57 Ohio St.3d 135, 138, 566 N.E.2d 1181 (1991).

### III.    Detriment to the Child

{¶ 54} In this case, no evidence was introduced that Mother abandoned the child, contractually relinquished custody of the child, or became totally incapable of supporting or caring for the child. Rather, the trial court found that Mother was unsuitable. In finding that Mother was unsuitable, the trial court concluded that an award of custody to the Mother would be detrimental to the child because of Mother's long-term drug use and "questionable sobriety at the time of the child's birth[.]" The trial court found that the foremost concern in this matter was Mother's history of drug use and "how this impacts her ability to care for the child."

{¶ 55} A significant basis for the trial court's decision was the presumptive positive test for amphetamines at the hospital in July 2020. But the point of the determination for the Mother's suitability was at the time of the February 9, 2021 hearing, not at the time of T.G.'s birth seven months before the hearing. The primary focus at the legal custody hearing should have been on the current suitability of Mother rather than focusing solely on the historical facts that initially brought T.G. into the custody of the Caregivers. *In re R.R.S.*, 2d Dist. Greene Nos. 2016-CA-25 & 2017-CA-45, 2018-Ohio-990, ¶ 20.

{¶ 56} The trial court questioned Mother's credibility. However, Mother's sobriety and suitability were independently established by witnesses the trial court found to be credible. Evidence was presented to the court that Mother had been sober since T.G.'s

birth. Notably, by the time of the hearing in February 2021, Mother had not had a single positive drug test since the July 2020 "presumptive positive" test, despite being tested randomly and often. Pursuant to a motion by the Caregivers, the trial court ordered Mother to take a hair follicle test. The results were negative. According to the trial court, "[t]he hair follicle test showed that the detected amount of amphetamines in Mother's sample was below the threshold amount but was not '0.' " Based on our review of the test results in the record, we find that the test results were negative and there was no evidence that the amount was "not '0'" simply because there were threshold levels. Additionally, Sonnycald testified that she randomly drug-tested Mother and the result was negative.

{¶ 57} McKinley, whom the trial court found to be credible, testified that Mother began working with Clearing Path on July 21, 2020, and successfully completed the intensive outpatient program on November 4, 2020. She explained that upon completing the intensive outpatient treatment, Mother progressed to the standard outpatient program, in which Mother continued to fully participate at the time of the hearing. According to McKinley, Mother had been sober with clean urinalyses done on a random basis, which were taken whenever they asked, but at least every two weeks. Mother also came in for drug screens more frequently than requested.

{¶ 58} At the time of the hearing, McKinley testified that Mother was attending two-hour outpatient groups twice per week and seeing her therapist twice per month. Mother was also attending AA/NA meetings outside of Clearing Path and had obtained a sponsor for the 12 Step Program. McKinley had no concerns or issues with Mother who, according to McKinley, was "100 percent" compliant. She believed that Mother had shown a high

level of commitment to recovery.

{¶ 59} Bailey, whom the trial court also found to be credible, testified that Mother actively participated in group treatment and individual therapy. Mother attended all groups and was compliant. According to Bailey, Mother was doing "extremely well" in treatment. Mother admitted to Bailey that she had a substance abuse problem and was trying to improve her life. In Bailey's professional opinion, Mother had made a positive transformation.

{¶ 60} The trial court questioned whether Mother had taken her own addiction seriously enough for her path to recovery but yet also found that there was "credible evidence that Mother ha[d] made considerable progress in her treatment and ha[d] demonstrated a willingness to remain drug free in more recent months." Consequently, the trial court granted Mother unsupervised parenting time pursuant to the Montgomery County Juvenile Court Phase-In Parenting Time schedule.

{¶ 61} There was no allegation of dependency, neglect, or abuse in this case. However, as a result of the presumptive positive drug screen at the time of T.G.'s birth, MCCS became involved. While briefly noting that Mother had successfully completed the case plan objectives and that, had MCCS been a party, it would have recommended custody be returned to Mother, the trial court seemingly disregarded Mother's progress simply by stating that MCCS was not a party. None of the progress Mother made was mentioned by the trial court in its determination of her suitability. While we agree that completing case plan objectives was not dispositive of the case, it was relevant to a determination of Mother's suitability, especially considering, as the trial court pointed out,

that Mother had not been legally obligated to complete the case plan, yet she still cooperated and successfully completed all the requirements anyway. While we acknowledge that the negative history of a parent cannot be ignored, neither should the progress a parent has made be so easily dismissed in a determination of a parent's suitability.

{¶ 62} Evidence was submitted to the court through exhibits and testimony of witnesses other than Mother to address her suitability. This evidence included that Mother had obtained and maintained appropriate housing in a single-family home that allowed for T.G. to have her own bedroom; the home was clean with all utilities and ample food in the home. Mother had all necessary and appropriate items to care for T.G. such as a crib, clothing, and diapers. Mother had obtained and maintained employment at Family Dollar for almost a year and had paid child support to the Custodians. There was no evidence of any arrearages for child support. Mother produced a W-2 and paystub that verified her employment. Mother successfully completed parenting classes on December 15, 2020 through Catholic Social Services.

{¶ 63} Mother attended all scheduled medical appointments for T.G. and was concerned for the child's health and well-being, as demonstrated by Mother's raising issues such as T.G.'s neck rash and skin problems while T.G. was in the care and custody of the Caregivers. Mother regularly attended visitation with T.G. for at least 15 hours per week and appeared appropriate with her at all times. J.C. testified that Mother had participated in more than 75 visitations between July 2020 and February 2021, and during that time, Mother only missed one visitation as a result of being ill. In fact, in deciding that

Mother should receive significantly more parenting time, the trial court found that "Mother has exercised substantial supervised visitation throughout the duration of this matter without concern." Mother and T.G. were bonded and Mother loved T.G. V.C. admitted that Mother had shown tremendous interest in visiting and connecting with her daughter.

{¶ 64} Even though T.G. was born early, she experienced no health problems, and the medical records indicate she was a healthy newborn. There was no evidence that T.G. had tested positive for drugs herself or that she portrayed any adverse effects after her birth. There was no evidence that she had any special needs or required any services.

{¶ 65} In our view, the record is devoid of evidence to support the trial court's determination that granting custody of T.G. to Mother would be detrimental to the child. The record does not reveal any direct evidence that Mother's parenting had caused harm or detriment to T.G. or that it would cause her harm. The trial court's finding could have only been based on an inference of potential, unidentified, future harm caused by past drug use. But "the standard for awarding custody to a nonparent under *Perales* is whether an award of custody to the parent *would* be detrimental to the child, not whether such an award of custody *could* be detrimental to the child in the future." (Emphasis sic.) *In re B.P.*, 191 Ohio App.3d 518, 2010-Ohio-6458, 946 N.E.2d 818, ¶ 55 (4th Dist.).

{¶ 66} A review of cases that have found detriment or harm to the child sufficient to support an unsuitability finding highlight that there must be serious problems in the conduct of the parent toward the child or in the parent's ability to provide for the basic needs of the child. *In re Medure*, 7th Dist. Columbiana No. 01 CO 03, 2002-Ohio-5035 (the children distrusted and feared the parent, who was verbally and physically abusive

toward them, including hitting them with ropes; the parent did not keep adequate supplies of food at home); *In re Z.A.P.*, 177 Ohio App.3d 217, 2008-Ohio-3701, 894 N.E.2d 342 (4th Dist.) (child had serious behavioral problems and claimed physical abuse by mother's live-in boyfriend; mother's house was dirty and in disarray; several unrelated individuals lived in the house including a known drug user; child had no structure at mother's home; child would be "emotionally devastated" if forced to return to home; and child's behavior had significantly improved and he had been removed from medications while he lived outside of mother's home); *In re A.W.-G.*, 12th Dist. Butler No. CA2003-04-099, 2004-Ohio-2298 (mother was unable to maintain employment and housing, child experienced rash due to lack of hygiene while in mother's care, and mother did not consistently provide care for child's medical issues); *Karr v. Dunn*, 4th Dist. Pickaway No. 03CA22, 2004-Ohio-928 (mother failed to provide financial support for child, abandoned child for several weeks, lived in six homes over four-year period, failed to provide consistent medical care for the child, and her home lacked electricity and running water and was unsanitary); *In re Adams*, 9th Dist. Wayne No. 01CA0026, 2001 WL 1338952 (Oct. 31, 2001) (the parent had disorderly conduct charges pending against him, had not paid child support for some time, and lacked stable housing and employment); *Evans v. Evans*, 2d Dist. Champaign No. 2012-CA-41, 2013-Ohio-4238 (mother had history of uncleanliness of her home, the child was undernourished, mother repeatedly failed to exercise parenting time, mother disciplined the child in an inappropriate manner, mother was unable to adequately protect the child from physical and emotional abuse by mother's boyfriend, and mother prioritized her relationship with her boyfriend over her relationship with her child); *In re P.L.H.,* 2d

Dist. Greene No. 2021-CA-6, 2021-Ohio-3522 (father intended to remove child with special needs to previously unsuccessful environment that would have been harmful to the child and against her wishes, father was not involved in child's special education or counseling, and father engaged in physical and mental actions toward the child that were very aggressive and inappropriate).

{¶ 67} It was the burden of the Caregivers to demonstrate that Mother was unsuitable, meaning that giving Mother custody of T.G. would be to T.G.'s detriment. Yet there is little if any evidence in the record addressing how T.G. would be negatively affected if returned to Mother's custody. Despite Mother's troubling drug history, by all indications Mother was able to adequately care and provide for T.G. at the time of the hearing. Just because the Caregivers may have been able to provide a better environment for T.G. did not mean that Mother's custody would be detrimental or harmful to the child.

{¶ 68} We recognize that the trial court's decisions in custody matters should be accorded the utmost respect; however, we find that the trial court's ultimate conclusion that retention of custody by Mother would be detrimental to T.G. thereby rendering Mother unsuitable was not supported by the record and is against the manifest weight of the evidence. Therefore, we sustain Mother's sole assignment of error.

{¶ 69} "Under App.R. 12(C), we are permitted in a civil action tried to the trial court without a jury, having found the judgment to be against the manifest weight of the evidence, to reverse the judgment 'and either weigh the evidence in the record and render the judgment or final order that the trial court should have rendered on that evidence or

remand the case to the trial court for further proceedings.' " *Cantrell v. Trinkle*, 197 Ohio App.3d 82, 2011-Ohio-5288, 966 N.E.2d 288, ¶ 50, quoting App.R. 12(C). Because we find that the trial court's judgment was against the manifest weight of the evidence, we reverse the trial court's judgment awarding legal custody of the child to the Caregivers and remand this matter to the trial court for further proceedings, including a hearing limited to developments in the case since the time of the prior hearing, at which both parties may submit any additional evidence.   Based on all of the evidence, the trial court must then make a determination as to Mother's suitability and the custody of the child.

{¶ 70} Because we sustain Mother's assignment of error, reverse the judgment of the trial court, and remand for further proceedings, the Caregivers' argument related to Mother's parenting time is not yet ripe for review.

## IV. Conclusion

{¶ 71} The judgment of the trial court is reversed and the case is remanded for further proceedings consistent with this opinion.

. . . . . . . . . . . .

DONOVAN, J. and EPLEY, J., concur.

Copies sent to:

Ben M. Swift
Cynthia L. Westwood
R.G., II
C.P.
Kirsten Knight, GAL
Hon. Anthony Capizzi