[Cite as *In re C.J.W.*, 2023-Ohio-4278.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO


| IN RE: C.J.W. | : | APPEAL NO. C-220543 |
| | | TRIAL NO. F21-200Z |
| | : | *O P I N I O N.* |


Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: November 29, 2023


*C.B.*, pro se,

*S.V.*, pro se.

**KINSLEY, JUDGE.**

{¶1} C.B. ("Mother") appeals from the judgment of the Hamilton County Juvenile Court granting legal custody of her minor son, C.J.W., to her older daughter S.V., C.J.W.'s half-sister ("Sister"). We conclude that the trial court's determination that Mother was unsuitable is not supported by the record and is against the preponderance of the evidence. Accordingly, the judgment of the trial court granting legal custody of C.J.W. to Sister is reversed, and the matter is remanded to the juvenile court to establish a transition schedule for C.J.W.

## *Factual and Procedural Background*

{¶2} In December 2020, the Hamilton County Department of Job and Family Services ("JFS") became involved with Mother and C.J.W. after being notified of both possible drug abuse by Mother and an alarming video of Mother's husband that was posted on social media. Due to these concerns, C.J.W. was placed with Sister under a safety plan. In March 2021, Sister filed a petition for legal custody of C.J.W. in the Hamilton County Juvenile Court. At a pretrial hearing in April 2021, JFS appeared and requested that Mother and her husband, J.B. ("Husband"), be limited to supervised visitation with C.J.W. due to the concern that they were using illicit drugs. Ultimately, JFS's request was granted, and interim custody was granted to Sister.

{¶3} At a pretrial hearing in August 2021, Sister reported that Mother had made progress in treating her addiction and that Sister believed unsupervised visits would therefore be appropriate at that time. JFS was also present and did not object to Mother having unsupervised visits with C.J.W.

{¶4}    In January 2022, Sister's custody petition was set for trial.  However, Sister requested a continuance due to Mother's progress, anticipating that she may no longer pursue custody if Mother maintained sobriety.  At this hearing, the magistrate noted that Mother had checked herself into intensive outpatient treatment for her addiction in December 2020 and had completed the program in six months.  However, the magistrate also noted that Mother had briefly relapsed in May 2021. Regarding Husband, the magistrate noted that he had also been in treatment and had been sober for seven and a half months.  Both Mother and Husband had been compliant with drug screens through their respective programs, and their respective drug screens were negative.  The trial was rescheduled for April 26, 2022 at 9:00 a.m.

{¶5}    The morning of the April 2022 trial, the magistrate mistakenly began the proceedings at 8:30 a.m. without Mother present.  Sister was in court, and the magistrate began by explaining aspects of legal custody to Sister, but no testimony was taken and no evidence was entered into the record.  At 8:45 a.m., Mother arrived and pointed out to the magistrate that the case was set for 9:00 a.m., not 8:30 a.m.  The magistrate apologized about the mistake and repeated what she had explained to Sister.  A number of witnesses then testified, including Sister, Sister's boyfriend, Mother, Mother's treatment provider, and a JFS worker.

{¶6}    First, Michael DiFabio, the JFS worker assigned to the case, testified that Mother had been doing well in her treatment and that, due to her progress, he would not object to C.J.W. returning to Mother.

{¶7}    Sister testified about Mother's parenting and drug addiction.  Sister testified that Mother had always had a problem with drugs and that she had observed Mother's drug addiction as a child herself.  Sister testified that she wanted what was

best for her brother and that she believed she could provide stability that Mother could not.

**{¶8}** Sister conceded that Mother had made significant progress towards her sobriety over the past year. When asked if Mother had ever participated in treatment before, Sister replied, "[n]ot the way she is now. Like I said, this time around she has done more than she ever has in the past." But Sister remained concerned about potential relapses in the future. She indicated that although Mother was making progress and doing more than she had previously to maintain her sobriety, she was concerned that Mother would fall into the same patterns as in the past. When asked by the magistrate why she was still seeking custody of her brother, Sister responded that her "worry is that eventually, you know life is going to happen, and it's going to go back." Ultimately, Sister testified that she was seeking custody due to her fear of Mother relapsing in the future.

**{¶9}** Sister's boyfriend testified that C.J.W. had been living in his and Sister's care for a period of time. He credited Mother and Husband for their progress in recovery and spoke highly of their efforts. He discussed the ways in which C.J.W. had bonded with his own children, who are unrelated to C.J.W. He also indicated that C.J.W. had previously struggled with spelling and other academic tasks, but had now improved. He did not tie C.J.W.'s deficits to Mother's drug use or to any other cause.

**{¶10}** Mother testified that she had struggled with her drug addiction for years. She explained that she began abusing drugs when she had to have repeated foot surgeries, which led first to her addiction to pain killers and later to heroine and methamphetamine. Mother testified that she relapsed at the end of April 2021, but had been clean in the year since then. She had entered into an intensive outpatient

4

treatment program, had been passing her drug screens, and had been attending three Alcoholics Anonymous meetings a week. Mother testified that, in addition to her addiction, she had been diagnosed with bipolar disorder and was seeing a psychiatrist at Greater Cincinnati Behavioral Health ("GCB") for that condition. She indicated that GCB monitored her disorder and prescribed medication to help manage it.

{¶11} Mother also described her living conditions and daily life. She testified that she had been employed at Dollar Tree for eight months and had started delivering Door Dash. She testified that she lived in a two-bedroom apartment with Husband, but they were saving up to purchase a home. Ultimately, Mother testified that she had been sober for a year and had been working very hard to do everything necessary to have C.J.W. come back home.

{¶12} Monica Goodman, Mother's counselor at GCB, also testified. Goodman indicated that Mother's recent drugs screens were negative, other than for her prescribed medication. She further testified that Mother had been maintaining her mental-health appointments, and relayed that she had seen significant improvement with Mother.

{¶13} On July 16, 2022, the magistrate issued a written decision granting legal custody to Sister. The magistrate found that "due to mother's long-term extensive substance abuse history, Hamilton County Job and Family Services history, criminal history, mental health diagnoses, and physical issues, legal custody to mother would be detrimental to the child." The magistrate also found that "mother loves her son, and provided she maintains sobriety, regular unsupervised parenting time is also in the child's best interest." Mother filed an objection to the magistrate's decision. On September 23, 2023, the trial court overruled Mother's objection and upheld the

magistrate's decision to grant legal custody to Sister. The court found Mother unsuitable based solely on her history of substance abuse with a recent relapse.

{¶14} Mother timely appealed from the trial court's decision.

### *Manifest Weight*

{¶15} Mother raises two assignments of error on appeal. First, Mother argues that the trial court erred by hearing testimony from Sister without her present. Second, Mother argues that granting Sister legal custody was against the manifest weight of the evidence. We will address Mother's second assignment of error first, because it is dispositive of this appeal.

{¶16} We review a trial court's decision on legal custody of a child under an abuse-of-discretion standard. *In re Patterson*, 1st Dist. Hamilton No. C-090311, 2010-Ohio-766, ¶ 15. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Moreover, because "[c]ustody issues are some of the most difficult and agonizing decisions a trial court judge must make * * * [t]he trial court judge must have wide latitude in considering all the evidence." *P.K. v. J.V.,* 2018-Ohio-5383, 128 N.E.3d 813, ¶ 33 (5th Dist.). "A trial court's decision that is not supported by competent, credible, evidence is unreasonable and may be reversed." *In re H.J.H.*, 1st Dist. Hamilton No. C-180019, 2019-Ohio-116, ¶ 3.

{¶17} Parents who are suitable have a paramount right to parent their children. *In re Perales,* 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977). This right has been described as "essential," a "basic civil right," and "fundamental." *See In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *In re Hockstok*, 98 Ohio St.3d 238, 2002-

6

Ohio-7208, 781 N.E.2d 971, ¶ 16.  It is secured by both the Ohio and United States Constitutions.  *Id.*

**{¶18}**  As a result, in a custody dispute between a parent and a nonparent, "parents may be denied custody only if a preponderance of the evidence indicates abandonment, contractual relinquishment of custody, total inability to provide care or support, or that the parent is otherwise unsuitable -- that is, that an award of custody would be detrimental to the child." *In re Perales* at 97.  When determining whether a parent is unsuitable,

> the trial court should focus on the detriment, or harm, to the child, as opposed to a value judgment about [the parent's] morality, character, or lifestyle.  Detriment to the child means that some type of harm is or can be suffered by the child, and the trial court should consider the extent and magnitude of harm that is likely to be experienced by a child being placed with his or her natural parent.  The appropriate analysis is whether the natural [parent] is unsuitable as custodian, not whether someone else is more suitable.

> * * *

> Nonparents seeking custody have the burden of demonstrating a parent's unsuitability.  The choice of taking custody away from a [biological] parent in favor of a nonparent * * * has a very high bar.  The issue of unsuitability of the [biological] parent is an extreme burden.  Biological parents have a fundamental liberty interest in the care, custody, and management of their children and a finding of parental

unsuitability is not to be made lightly. If the parent is suitable, then custody must be given to the parent.

(Internal quotation marks and citations omitted.) *In re T.G.*, 2d Dist. Montgomery Nos. 29327 and 29328, 2022-Ohio-1521, ¶ 51, 52. The focus of a custody hearing as to a parent's suitability should be on the parent's current ability to care for the child and not historical facts as to how the child came into the nonparent's care. *Id.* at ¶ 55.

{¶19} Initially, our review of the record shows that the trial court did not specify which of the *In re Perales* factors supported its finding of Mother's unsuitability. Under *In re Perales*, the trial court must find, by a preponderance of the evidence that: 1) the child was abandoned; 2) the parent contractually relinquished custody; 3) the parent is unable to provide care and support for the child; or 4) an award of custody to the parent would be detrimental to the child. *See In re Perales* at 97, 369 N.E.2d 1047. Yet the trial court's order is void of any explanation of these factors, instead only generically finding Mother to be an unsuitable parent for C.J.W. based on her history of substance abuse and a year-old relapse. Making matters worse, the trial court also neglected to make a finding that its determination of unsuitability was based on a preponderance of the evidence, the required standard of review in these cases. *See In re P.M.*, 8th Dist. Cuyahoga No. 109968, 2021-Ohio-3358.

{¶20} Given the constitutional rights afforded to parents and the clear dictates of *In re Perales*, these errors in the trial court's application of the legal standards that govern custody cases involving parents and nonparents constitute an abuse of discretion and warrant reversal. But even if the trial court's order denying Mother's objections were viewed as adopting the magistrate's decision, which was more detailed

in terms of the *In re Perales* standards, the trial court's decision that Mother is an unsuitable parent is against the manifest weight of the evidence.

**{¶21}** In reaching this conclusion, we are guided by the decision of the Second District in *In re T.G.,* 2d Dist. Montgomery Nos. 29327 and 29328, 2022-Ohio-1521. In that case, a mother prematurely gave birth to her daughter while presumptively testing positive for amphetamine. *Id.* at ¶ 2. An investigation revealed concerns about the mother's truthfulness, long-standing drug use, and relationship with the father. *Id.* at ¶ 14. The baby was then placed with caregivers, and the mother pursued addiction treatment. *Id.* at ¶ 3, 31. At the time of the custody hearing, the mother had been sober for approximately seven months, had completed a number of recovery programs, was employed, and had secured housing for her and her daughter. *Id.* at ¶ 57-64. While the trial court questioned the mother's credibility as to her testimony about her own progress, several witnesses from treatment providers testified to verify that the mother had attended and completed specific stages of treatment programs. *Id.* at ¶ 56. In addition, there was no evidence that the baby had any medical issues or conditions related to the mother's presumptive positive drug test at the time of her birth. *Id.* at ¶ 64. Nevertheless, the trial court found the mother unsuitable to parent on the basis of the mother's history of drug abuse and questionable sobriety in delivering her child. *Id.* at ¶ 54.

**{¶22}** The court of appeals reversed the trial court's determination, finding it to be against the manifest weight of the evidence. *Id.* at ¶ 68. In reaching this conclusion, the Second District emphasized the lack of any evidence indicating that the mother's historic drug use had created any detriment to the child. *Id.* at ¶ 64, 65. The court cautioned against making inferences of "potential, unidentified, future harm

caused by past drug use." *Id.* at ¶ 65. And it emphasized that there must be "serious problems" related to the parent's ability to provide for a child's basic needs to find a parent unsuitable under the fourth *Perales* factor. *Id.* at ¶ 66. No such serious problems exist, in the court's view, when a parent suffering from addiction has established a seven-month track record of sobriety. *Id.* Furthermore, the court cautioned against too heavily weighing a parent's prior struggles without crediting the parent's efforts to overcome them, a misstep the trial court had made by not considering the mother's recent sobriety, employment, housing, and treatment progress. *Id.* at ¶ 61 ("While we acknowledge that the negative history of a parent cannot be ignored, neither should the progress a parent has made be so easily dismissed in a determination of a parent's suitability.").

{¶23} This case is remarkably similar to *In re T.G.* Following the April 26, 2022 trial, the trial court concluded that Mother was unsuitable because "[m]other has had a history with substance abuse, with a recent relapse, while participating in substance abuse treatment services." But, just as in *In re T.G.*, the trial court failed to credit Mother's year-long progress towards sobriety and the lack of any evidence connecting Mother's previous use of drugs to any detrimental impact on C.J.W.

{¶24} This case is also similar to the opinion of this court in *In re H.J.H.*, 1st Dist. Hamilton No. C-180019, 2019-Ohio-116. In that case, both the mother and father historically struggled with substance-abuse problems. *Id.* at ¶ 2. As a result, the child went to live with her grandparents, although legal custody remained with the mother. *Id.* Father then engaged in treatment for his addiction and had been sober for two years before seeking legal custody of his child. *Id.* A guardian ad litem ("GAL") appointed for the child recommended that legal custody stay with grandparents. *Id.*

The recommendation was premised on the father's perceived unsuitability in light of the grandparents' superior ability to care for the child. *Id*. at ¶ 9. The trial court accepted the GAL's recommendation, finding it in the child's best interest to remain with the grandparents. *Id*. at ¶ 2.

**{¶25}** On appeal, this court reversed, emphasizing the distinction between unsuitability, which focuses on whether a parent's current situation presents a detriment to the child, and what may be in the child's best interest, which places the child in the best environment. *Id*. at ¶ 12, 14. In terms of unsuitability, there was very little evidence to support the trial court's finding: the father had maintained sobriety for three years, had stable housing with his girlfriend, and had stable employment, although his driver's license was suspended, and he occasionally drove outside of his privileges with the child in the car. *Id*. at ¶ 8, 15, 16. This court accordingly held that "a preponderance of the evidence did not show that father was unsuitable." *Id*. at ¶ 15.

**{¶26}** Relevant to unsuitability and whether the parent's current condition is detrimental to the child, the father in *In re H.J.H.* and the mother in *In re T.G.* made similar improvements as Mother has made here. On this point, Mother testified that although she had previously relapsed, she had been sober since April 2021, a longer period of sobriety than that achieved by the mother in *In re T.G.* There was no evidence presented at trial that Mother had used drugs during the year between her April 2021 relapse and the April 2022 trial. To the contrary, the evidence presented at trial supported Mother's assertion that she had been drug-free. Moreover, to buttress her suitability as a parent, Mother testified that she had been attending treatment meetings, had been employed for several months, lived in highly stable housing, maintained contact with C.J.W., and was receiving mental-health treatment.

{¶27} Goodman, Mother's counselor, also testified about Mother's substantial progress in treatment. The magistrate gave "little credibility to her testimony as she is not qualified as an actual substance abuse treatment provider," a finding not addressed by the trial court in its final decision. Nevertheless, we interpret Goodman's testimony as being offered to verify that Mother was following her treatment plan, not as expert testimony. Goodman testified that Mother had been passing her drug screens, had graduated from group therapy, and had been working with her individually. As was the case in *In re T.G.*, this evidence was offered to support Mother's own testimony, and Goodman needed no particular license or credentials to verify Mother's presence and participation in these programs.

{¶28} The inquiry in a custody dispute between a parent and a nonparent focuses on a parent's suitability at the time of the hearing, not something a parent may have done in the past. *See In re T.G.*, 2d Dist. Montgomery Nos. 29327 and 29328, 2022-Ohio-1521, at ¶ 55. At the time of the hearing, Mother had established one year of sobriety, had secured gainful employment and stable housing, was living with a supportive partner, and was saving to purchase her first home. This is similar to the improvements that father had made in *In re H.J.H.* There was no evidence in the record to suggest that she was incapable of caring for C.J.W., much less any "serious problem" with regard to her ability to parent. Thus, the weight of the evidence failed to demonstrate that Mother was an unsuitable parent or was unable to care for C.J.W.

{¶29} This is all the more true given how truly little evidence was presented to demonstrate any detriment to C.J.W. from Mother's struggles with addiction. While Sister and her boyfriend did testify that C.J.W. performed less well academically before residing with them, that testimony did not link C.J.W.'s academic performance

to Mother's drug abuse. There was no other evidence presented regarding the potential impacts of Mother's drug abuse on C.J.W., and we decline to simply infer, in the absence of facts, that C.J.W. suffered any direct harm as a result of his Mother's addictive disorder.

{¶30} Nor can the assumption that Sister would provide a more stable life for C.J.W. than Mother, however valid, itself supply detriment in the absence of other evidence. As the Seventh District emphasized in *In re Davis*, "simply because one situation or environment is the 'better' situation does not mean the other is detrimental or harmful to the child." (Internal citation and quotation marks omitted.) *In re Davis*, 7th Dist. Mahoning No. 02-CA-95, 2003-Ohio-809, at ¶ 12.

{¶31} Instead, the standard of detriment is serious and exacting. Describing detriment in the parent/nonparent custody context, this court has noted that:

> [D]etriment to the child [exists] in cases where a parent has exposed the child to verbal and physical abuse, where the child is in a chaotic environment filled with domestic violence, and where the child has animosity toward the parent which causes mental and physical problems. *In re M.B.*, 9th Dist. Summit No. 26004, 2012-Ohio-687 (child exposed to verbal and physical abuse due to parents arguing and fighting); *In re D.D.*, 2017-Ohio-8392, 100 N.E.3d 141 (7th Dist.) (child experienced physical manifestations of anxiety when faced with visiting with father).

*In re H.J.H.*, 1st Dist. Hamilton No. C-180019, 2019-Ohio-116, at ¶ 7.

{¶32} In this case, rather than focusing on the detrimental impact to C.J.W. of living in Mother's custody, the trial court's unsuitability analysis focused almost

entirely on Mother's previous drug abuse. At no point did the trial court consider whether the required detriment to C.J.W. existed, and if so, what facts demonstrated the detrimental impact of Mother's history with drugs on C.J.W. In fact, the trial court did not articulate any reasons other than Mother's *past* drug history as a basis for finding her to be unsuitable. But the record shows that at the time of trial, Mother was maintaining her sobriety, was employed, had housing, had taken responsibility for her past actions, had been taking the necessary steps to address her past drug-abuse issues, had been testing negative at her drug screens, had been working with JFS, was attending meetings multiple times a week, was in counseling, was seeing a doctor for her mental-health issues, and had been making all her appointments needed for her recovery.

{¶33} The issue before us is not whether awarding custody to Sister would be in C.J.W.'s best interest. The record clearly shows that Sister is more than capable and willing to provide for C.J.W. and that she genuinely wants what is best for him. However, given the constitutional protections afforded to parents, *In re Perales* does not instruct us to compare Mother and Sister, or which home is better suited for C.J.W., absent evidence that Mother is unsuitable. No such evidence was presented in this case.

{¶34} Based upon the evidence presented at trial, the trial court's finding that Mother was unsuitable was not supported by competent, credible evidence. *See Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12. Therefore, the juvenile court abused its discretion in awarding custody to Sister. We sustain Mother's second assignment of error, reverse the juvenile court's judgment, and remand the cause for the trial court to award custody to Mother and

14

determine an appropriate transition schedule. We encourage the parties and the trial court to work together to minimize the impact on C.J.W. of transitioning custody back to Mother.

**{¶35}** Because we have sustained Mother's second assignment of error, we decline to address her first assignment of error, because it is moot. *See* App.R. 12(A)(1)(c).

**{¶36}** The trial court's judgment is reversed, and the matter is remanded to the trial court for proceedings consistent with this opinion and the law.

Judgment reversed and cause remanded.

**WINKLER, P.J., AND BOCK, J., CONCUR.**

Please note:

The court has recorded its own entry on the date of the release of this opinion.